Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLORADO

3    Civil Action No. 12-cv-00750-WYD-CBS

4    PHILIP W. WYERS, et al.,

5              Plaintiffs,

6    vs.

7    GREENBERG TRAURIG, LLP, et al,

8              Defendants.

9

10          DEPOSITION OF MELINDA M. HARPER, CPA

                   October 4, 2013

11

12   APPEARANCES:

13   FOR THE PLAINTIFFS:        MATTHEW NELSON, ESQ.

                                Semler & Associates, P.C.

14                              1775 Sherman Street

                                Suite 2015

15                              Denver, CO  80203

                                matt@semlerlaw.com

16

     FOR THE DEFENDANTS:        ROBERT G. PLUTA, ESQ.

17                              Steptoe & Johnson, LLP

                                115 So. LaSalle Street

18                              Suite 3100

                                Chicago, IL  60603

19                              rpluta@steptoe.com

20

21

22

23

24

25

EXHIBIT 3

1          PURSUANT TO WRITTEN NOTICE, the deposition of

2     MELINDA M. HARPER, CPA, called for examination by the

3     Defendants, was taken in a conference room at Treece

4     Alfrey Musat, P.C., 999 18th Street, Suite 1600,

5     Denver, Colorado, on the 4th day of October, 2013, at

6     the hour of 9:03 a.m., before Bonnie Carpenter, a

7     Notary Public and Certified Shorthand Reporter in and

8     for the State of Colorado, a Registered Professional

9     Reporter, and Certified Realtime Reporter.

10                     * * * * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

# I N D E X

2   Index of Examination                  Page

3   Mr. Pluta                             4

4   Index of Exhibits                     Page

5   101 Melinda Harper report             3,18,23,31,32,35,37
                                          42,44,53,56,66,74,101

6   102 4-29-13 e-mail thread between
        Philip Wyers and Matt Nelson  33,45,46,49,89

7

    103 5-1-13 e-mail from Matt Nelson
8       to Melinda Harper              ?,45,46,49,91

9   104 5-3-13 e-mail thread between
        Melinda Harper and Matt
10      Nelson                         3,45,46,47,49,51

11  105 5-5-13 e-mail thread between
        Matt Nelson and Melinda
12      Harper                         3,45,46,49

13  106 Supplemental Schedules         39,40,46

14  107 Preliminary Rule26 Expert
        Report of Ambreen Salters      106,107,114

15

16

17

18

19

20

21

22

23

24

25

1                    *********

2            (Exhibits 101 through 105 marked.)

3            MELINDA M. HARPER, CPA,

4   called as a witness for examination under the Rules,

5   having been first duly sworn according to law, was

6   examined and testified on her oath as follows:

7                      EXAMINATION

8   BY MR. PLUTA:

9        Q    Good morning.

10       A    Good morning.

11       Q    Can you please state your name and

12  address for the record.

13       A    It's Melinda Marion, M-a-r-i-o-n,

14  Harper, H-a-r-p-e-r, 1580 Lincoln Street, Suite 1100,

15  Denver, 80203.

16       Q    Ms. Harper, I represent the defendants

17  in this case, and I'm going to ask you a number of

18  questions today.  It looks like from your resume,

19  you've been deposed a fair number of times before.

20       A    I have.

21       Q    So I'm going to dispense with the

22  procedures.  But you understand that you've been given

23  an oath to tell truthful answers today?

24       A    Yes.

25       Q    Is there any reason that you would not

1   be able to do that today?  You know, medications, under

2   the weather --

3          A    No.

4          Q    -- et cetera?

5          A    No.  I'm -- I'm fine.  Thank you.

6          Q    Okay.  Great.  Did you meet with anyone

7   to prepare for your deposition today?

8          A    Yes.

9          Q    And who did you meet with?

10         A    Mr. Nelson.

11         Q    And when did you meet with Mr. Nelson?

12         A    I believe it was last week.  Early to

13  mid-part of last week.

14         Q    Is that the only time you met with him

15  to prepare for your deposition?

16         A    Yes.

17         Q    And where did you meet with him?

18         A    At his office.

19         Q    About how long did you meet?

20         A    Maybe 45 minutes.  Half an hour.  45

21  minutes.  Something like that.

22         Q    Was there anyone else in the -- in the

23  meeting?

24         A    No.

25         Q    So Mr. Wyers didn't attend?

1        A    No.

2        Q    Who else have you spoken with regarding

3    your deposition today?

4        A    Well, I spoke with Mr. Nelson.  I spoke

5    briefly in the corridor outside the conference room

6    with Mr. Semler.  I spoke with one of my staff, Jenna

7    Klos.

8        Q    And more broadly speaking, have you

9    spoken about this case with -- with anyone, other than

10   the people you've just mentioned?

11       A    In -- prior to this last short period,

12   which is what I thought you were asking about, I've

13   also spoken with Mr. Weiss from my office, I may have

14   spoken about it with Ms. Morgan.  I believe I did have

15   a conversation with Mr. Wyers early on.  That's

16   everyone that I recall.

17       Q    And who is Mr. Weiss?

18       A    Mr. Weiss is one of our senior

19   associates.

20       Q    Did Mr. Weiss help you put together the

21   report in this case?

22       A    He did.

23       Q    And what was Mr. Weiss's role in putting

24   together the report?

25       A    It's been a while ago.  As I recall, he

1  assisted with the schedules and he reviewed the -- the

2  narrative report.  I had drafted it and worked with

3  Ms. Klos and Ms. Morgan and -- and then I was, I

4  believe, in trial, and he picked up finishing it and

5  getting it issued, as I recall.

6          Q    Did he perform the calculations that are

7  represented in the schedules to your report?

8          A    He may have prepared some of them.  I

9  don't -- I don't recall.

10         Q    And you mentioned a Ms. Morgan.  What --

11 who is Ms. Morgan?

12         A    Randi Morgan is one of our associates.

13         Q    Randi, is that a woman?

14         A    It's a woman.

15         Q    And what, if any, was Ms. Morgan's role

16 in preparing the report?

17         A    My recollection is that she assisted

18 with -- with the preparation of some of the schedules,

19 but I -- I don't recall at this point specifically.

20         Q    Did Ms. Morgan prepare -- strike that.

21              Did Ms. Morgan calculate any of the

22 numbers in the schedules to your report?

23         A    She may have.  I don't recall.

24         Q    And who is Ms. Klos?

25         A    Jenna Klos is another of our associates.

1          Q    And what, if any, was Ms. Klos's role in

2     preparing your report?

3          A    My recollection is that she was the one

4     who initiated the -- the schedule preparation.

5          Q    What do you mean by "initiated the

6     schedule preparation"?

7          A    I mean that she worked with me under my

8     direction and supervision to -- when we started the

9     report and the assembly of information.  We got

10    communications from counsel about what they wanted us

11    to do and I went over those with her.  We discussed

12    them.  And then she began putting together the models

13    and -- and I believe that she worked with Ms. Morgan

14    and she also worked with Mr. Weiss.

15         Q    When you say "putting together the

16    models," what do you mean by that?

17         A    Computer models, Excel models.

18         Q    Okay.  So you put the information in

19    and -- whatever happens, it spits it out?

20         A    Well, it's not quite that simple.

21    But --

22         Q    Understood.

23         A    Yeah.  But -- but it's the -- it's the

24    tool --

25         Q    The inputting of data?

1        A    It's the inputting of data and figuring

2   out of formulas and using Excel to display the

3   information, summarize it, and then have that available

4   for the narrative.

5        Q    Okay.  Thanks.  And you mentioned you

6   spoke with Mr. Wyers early on.  Do you remember when

7   that was?

8        A    No, I don't.

9        Q    And was that a telephone conversation?

10       A    It was.

11       Q    And what did you talk with Mr. Wyers

12   about?

13       A    My best recollection at this point is

14   that we discussed the methodology, the timing, the

15   cost, what we would need from -- from him via his

16   counsel, and from his counsel to be able to do what

17   they wanted within the cost frame that we had

18   discussed.

19            There was some -- some background

20   information at that time, but I believe it -- prior to

21   speaking with him, I'd read the complaint and -- and/or

22   the amended complaint, so I understood the -- the

23   parameters of the case.

24       Q    You mentioned in your discussion with

25   Mr. Wyers, you talked about a cost frame.  What -- what

Page 10

1    was that?

2         A    He wanted to -- to have an idea of what

3    it would cost, and he wanted to do it on as low a cost

4    as possible.  And I discussed with him that the things

5    that would help keep costs down were supplying all the

6    information at once, having it all together, having all

7    the details there, having us not need to ask too many

8    questions.  That it was supplied, you know, cleanly and

9    understandably.

10            So we went through those kinds of

11   things, and then I believe I listed the type of

12   information that, given what they were asking me to do,

13   we would need to have, which is then sent to me through

14   Mr. Nelson.

15        Q    And was there a fee cap, for lack of a

16   better word, that Mr. Wyers communicated to you?

17        A    No.  He was hoping to keep the whole

18   thing under a certain amount, but I told him that I

19   couldn't commit to that.  It was -- these kinds of

20   cases are not under my control.  But that I would

21   commit to doing it as -- as cost-effectively as I could

22   and -- and still -- and still do what needed to be done

23   to provide a good -- good work product.

24        Q    What was his hope that you could get the

25   project done for?

1       A    I think what he was hoping was that the

2    whole case -- that my -- my fees for the -- for

3    everything I was asked to do would be approximately

4    $10,000.

5       Q    And I know you said that you had

6    indicated to him that you'd try to be as efficient as

7    possible or whatever your testimony was, but what,

8    ultimately, were your total fees so far billed in this

9    matter to Mr. Wyers?

10       A    In terms of billings -- and I don't

11    remember exactly, but I think we have billed

12    approximately 7- to -- to 8,000 dollars.  In that

13    range.

14       Q    I guess we can do the math, but do you

15    have approximately how many hours that you, yourself,

16    have spent on this project?

17       A    I don't.  I haven't looked at -- I

18    haven't looked at the respective hours that people have

19    spent, including my own.

20       Q    And the people that assisted you with

21    your report, Mr. Weiss, Ms. Morgan, Ms. Klos, are their

22    billing rates lower than yours?

23       A    Yes.

24       Q    And I believe you bill at 365 an hour;

25    is that correct?

1       A    Yes.  370 now.

2       Q    What's the billing range of -- of your

3  associates?  If you know them specifically, I'd like to

4  know that, but, you know, generally, if you can testify

5  to what their range is, that's fine.

6       A    My recollection is that Ms. Morgan and

7  Ms. Klos's billing rates currently are the same, and I

8  believe it's 155 or 160 an hour is my recollection.

9            Mr. Weiss, I believe, is -- is 225 or

10  230, as I recall.  I may be off a little bit, but

11  they're in that range.

12       Q    When you were having that conversation

13  with Mr. Wyers, you testified that you explained to him

14  what you would need?

15       A    Yes.

16       Q    Is that fair?  What -- what did you

17  explain to him when you were talking with him what you

18  would need?

19       A    I told him that we would need the -- the

20  specific amount of -- of -- that related to the various

21  damages elements, the time frames, the -- the details

22  about the interest rates, the sources for the interest

23  rates.  That kind of thing.  It had to be, you know,

24  specific because he was asking us to do some fairly

25  complicated modeling and -- and to do that, as you fit

1    things into formulas, you have to have exact amounts,

2    you have to have exact dates, you have to know whether

3    you're compounding annually or monthly.  That kind of

4    thing.  I went through those types of things with him.

5              Q    Anything else that you asked for?

6              A    Not that I recall.

7              Q    Was there anything that you asked for

8    that he wasn't willing to give you?

9              A    No.

10             Q    And what kind of background information

11   did Mr. Wyers give you during that call?

12             A    As I said, it was somewhat limited

13   because I had already looked at the complaint or the

14   amended complaint or both before we had that call.

15   That's my preferred way of operating, rather than

16   having a call that's in a vacuum, so I had -- I had

17   some background and I think I might have also spoken

18   with Mr. Nelson before we had that conference call, as

19   well.

20             So I -- I think that there wasn't a -- a

21   ton of background information.  There may have been

22   some clarification about the damages and -- and

23   components of the damages.  That's my best recollection

24   at this point.

25             Q    What kind of clarification would you

Page 14

1    seek from Mr. Wyers about the damages?

2            A     Just the details that -- that -- in

3    terms of what the exact bases for each loss were going

4    to consist of.  So it was really more getting into the

5    details of what the -- of what in the complaint tend --

6    tend to be more general.

7            Q     Did you have any questions about the

8    complaint, the allegations in the complaint that you

9    asked of Mr. Wyers to clarify?

10           A     Not other than the types of things I've

11   just described.  Amounts and dates and rates.  That

12   type of thing.  I have worked on these cases-within-

13   cases type of cases before, so I understood the -- the

14   general issues that you have in those types of cases.

15   So I didn't need clarification of that.  It was clear

16   to me the type of case that it was.  So I don't recall

17   asking for more details on the complaint or the amended

18   complaint.

19           Q     And at that time, what was your

20   understanding of what type of case this was?

21           A     It's a malpractice case and it is a --

22   sort of what I call -- I think the literature refers to

23   it as a case within a case where there's been an

24   outcome and -- and the dispute is -- assumes that a

25   different outcome would have been appropriate if things

1    had happened the way they should have happened.

2            Q    And the case within this case, what did

3    you understand the former to be?

4            A    I'm sorry.  I didn't understand that.

5            Q    The case that's within this case, what

6    did you understand that case to be?

7            A    I'm sorry.  Could you -- I'm not quite

8    understanding the first part of the question.

9            Q    Well, I'll just ask a direct question,

10   then.

11           A    Okay.

12           Q    Did you understand that the -- why we're

13   here today has to do with a patent case?

14           A    Yes, I did understand that.

15           Q    And -- and did you understand that it

16   related to a patent case that was appealed to the

17   Federal Circuit?

18           A    Yes, I did understand that.

19           Q    Okay.  Did you review any documents in

20   preparation for this deposition?

21           A    I looked at our report.  I looked at the

22   report of the -- your expert.  I looked at --

23           Q    Ms. Salters?

24           A    Yes.

25           Q    Okay.

1          A    I looked at the e-mails that we had

2     received, summarizing some of the data -- summarizing

3     the data that we -- that we used to do our

4     calculations.

5          Q    Anything else?

6          A    I believe that's all.

7          Q    Prior to this engagement, have you

8     worked with the Semler firm before?

9          A    I have.

10         Q    In what context?

11         A    In each case that we worked together, it

12    was a -- in a litigation environment and as I recall,

13    they were all -- all the cases related to damages.

14         Q    About how many cases prior to this one

15    have you worked with the Semler firm?

16         A    My best recollection is that it's 2.

17         Q    2?

18         A    2.

19         Q    Prior to this engagement, had you met

20    Mr. Wyers?

21         A    No.

22         Q    And we already established you spoke

23    with him on the phone.  Have you ever met him in

24    person?

25         A    I had not.

1        Q    And that phone call that you had early

2   on, was that the only phone call that you had with him?

3        A    Yes.

4        Q    And you submitted your report in this

5   case on May 7th of this year.  Do you recall about

6   when prior to then that you talked with Mr. Wyers?

7        A    It was prior to that, clearly, but I

8   don't -- I don't have -- I don't have a recollection of

9   that time frame.

10       Q    Was it like a month before?

11       A    I would say it was at least that.  It

12  might have been a little bit longer than that.  It

13  wasn't six months prior.  But I don't recall.

14       Q    So when was the first time you were

15  approached to provide an opinion in this case?

16       A    It would have been around very close to

17  the first time that I spoke with to Mr. Wyers.  As I

18  said, I believe Mr. Nelson called me prior to that

19  conference call, but it would have been around that

20  same time frame that I've described.

21       Q    And please tell me the circumstances

22  surrounding your engagement.

23       A    It's kind of a general question.

24  Mr. Nelson called.  Gave me the names of the parties.

25  And the opposing counsel described a little bit about

1   the case.  We then, which is our practice, circulated

2   the names in the office.  Didn't surface any conflicts

3   or relationships.  Called him back, told him that I

4   thought we could do it.  We agreed that we would have a

5   conversation that was just with Mr. Wyers about what we

6   would do and costs.

7               And so we had that conversation and

8   then, as I recall, either before that call or right --

9   probably right after that call, I sent a proposed

10  retention letter, I suspect would be my typical

11  practice to send it to Mr. Nelson, who would then give

12  it to Mr. Wyers.

13              And as I recall, we received that letter

14  back and then we also received a retainer and then we

15  started receiving the -- the detailed data that I had

16  said I would need to do the calculations.  I think

17  that's a pretty good general chronology.

18       Q    What kind of retainer did you receive

19  from Mr. Wyers?

20       A    I believe it was either 5,000 or 7,500.

21  I don't remember right now.

22       Q    I'm going to hand you what's been marked

23  as Deposition Exhibit 101.  If you could just page

24  through that, I'd like to know whether you believe this

25  is a complete copy of your report in this case.

1          A     It appears to be.

2          Q     Okay.  Ms. Harper, you're not a lawyer;

3    right?

4          A     I am not.

5          Q     And you're not an engineer, as well?

6          A     I am not an engineer.

7          Q     Your degree is in accounting?

8          A     It is.  Well, actually, I have a degree

9    in business administration with a major in accounting.

10         Q     Okay.  And you're a CPA, though?

11         A     I am.

12         Q     Would you turn to -- I guess it's page 5

13   of your resume.

14         A     To the last page?

15         Q     Yes.

16         A     There it is.  Page 5 at the top.

17         Q     So four items down, it -- it notes that

18   you're a member of the Advisory Council of the American

19   Arbitration Association from 1992 to 1999.  What --

20   what did that involve?

21         A     The -- when Mike Copel was here as the

22   head of the local office, we had a committee that

23   worked on kind of streamlining the panel, beefing it up

24   where there were areas that they didn't think they had

25   enough members.  And as I recall, we -- we worked on

1   that over a period of time and then as they got more --

2   as the panels got organized more in a -- through

3   technology, that -- that stopped and they said they put

4   in place some fairly -- a set of procedures, routines

5   that handled some of the things that we had been doing,

6   but I think we also -- we had a number of people who

7   were still listed as panel members who were deceased.

8   We were trying to clean up the panel and beef it up, as

9   I recall.

10          Q     And the reason I asked, I just want to

11   confirm that you're not offering any opinions in this

12   case about what occurred during the Federal Circuit

13   mediation, are you?

14          A     No, I'm not.

15          Q     About what percentage of your work do

16   you devote to litigation consulting?

17          A     It's the -- it's the biggest proportion

18   of what I do.  It varies a little bit from -- from year

19   to year, but -- and I -- and I include that -- under

20   that umbrella, I include cases where there's a

21   potential claim, there's an actual claim, whether it's

22   arbitration, court, mediation, prelitigation.  Any of

23   those categories.  And so it's probably between 90 and

24   98 percent each year.

25                The work that I do in ADR, I keep

Page 21

1    separate from that, and work that I do relating to due

2    diligence or other kinds of strategic analysis, I keep

3    separate from that.  The skills are similar, but I

4    don't -- don't do as much of it.  So it's -- it's the

5    bulk of what I do.

6              Q    And so that remaining 2 or so percent is

7    the ADR and --

8              A    Due diligence.

9              Q    -- due diligence?

10             A    And it's -- I said it ran from 10 to 2.

11   10 to 2 percent.

12             Q    Sure.  The balance is those activities

13   versus litigation consulting?

14             A    Correct.  And I'm assuming you're asking

15   only about my client time; not the time I spend for the

16   firm.

17             Q    Right.  I'm sure that's fairly

18   extensive.

19             A    It is.

20             Q    Okay.  If you could turn to Attachment 3

21   of your report.  Are these all the cases that you have

22   given testimony in for the last four years?

23             A    Well, not at this point because it's now

24   October of 2013, and I have testified since December of

25   2012.

1        Q     About how many times?

2        A     Oh, somewhere between four and six

3 times.  Four to seven times.  I don't have a count in

4 my head of how many times.  It gets filled out pretty

5 automatically when I testify, so I don't -- I don't

6 recall.

7        Q     Would this list be bigger if you

8 included the cases you were involved in that you just

9 issued a report and did not give a deposition or

10 testify at a hearing?

11       A     Yes.

12       Q     About how many cases do you handle per

13 year relating to litigation consulting?

14       A     I would estimate somewhere between 30 to

15 50 cases.  I have a lot of cases that are on hold.  I

16 get started and then we go to a certain point and then

17 they're waiting for trial.  We have cases that start --

18 I start and finish rather quickly.  Others that go on

19 in fits and starts.  So it can vary.  But at any one

20 time -- some status or another, there's probably

21 somewhere between 20 to 40 cases.

22       Q     And about what percentage of your cases

23 that you take on are you offering an opinion for the

24 plaintiff?

25       A     I don't have a -- a count of that over

1   time.  But because I get asked that question quite

2   often, a few years ago, I took like four years and I

3   counted.

4          Q     Okay.

5          A     And in some years, it's 60/40 one way.

6   Some years, it's 50/50.  Some years, it's 60/40 the

7   other way.  It varies, but it's not weighted

8   particularly one way or the other.

9          Q     Looking at Attachment 3 of Exhibit 101,

10  the cases in which you've testified over the last four

11  years, were any of these cases patent cases?

12         A     No.  I don't believe so.

13         Q     So is it fair to say that you've never

14  calculated a reasonable royalty in a patent case in the

15  last four years?

16         A     No.  I don't know if I have or I have

17  not.  I've certainly been involved with that.  I don't

18  know if we did that type of project in -- in the last

19  four years.  I don't -- I don't recall.

20         Q     Well, if none of these cases over the

21  last four years dealt with patents, is it fair to say

22  that none of your engagements over the last four years

23  with which you testified involved calculating a

24  reasonable royalty for a patent?

25         A     If you limit it to the cases in which

Page 24

1    I've testified, that's correct.

2          Q    Okay.  That was my first question.  The

3    second question is have you ever calculated a

4    reasonable royalty in a patent case?

5          A    Yes.

6          Q    And tell me about that.

7          A    I have done it in more than one case.  I

8    don't recall the -- specifically the last case that

9    we've done it in.  The -- typically, when we're looking

10   at a reasonable royalty, we're also looking at -- at

11   other damages issues, either for the plaintiff or the

12   defendant.  So when we -- when we get a case like that,

13   then we -- we look at the appropriate methodology to

14   calculate a reasonable royalty, do the research, to

15   come up with what we think a reasonable royalty is in

16   the situation.

17         Q    Have you ever acted as an expert for

18   either a plaintiff or defendant where the sole issue in

19   the case was assertion of one or more patents?

20         A    Where the sole issue --

21         Q    You know, versus like here, where it's

22   malpractice, and there's a case within a case?

23         A    Yes.

24         Q    You know, like where a plaintiff is

25   suing another defendant for patent infringement.

1          A    Yes.

2          Q    You have?

3          A    Yes.

4          Q    And what case was that?

5          A    I've done it more than once over the

6     approximately 30 years I've been doing this.  I don't

7     have a list of those cases.  When I'm done with a case,

8     I don't tend to keep a list in my head, even, of them,

9     but I can remember the lawyers for a couple of them.  I

10    don't remember a lot of the details about -- about the

11    issues.

12              I can think of one that was relatively

13    recent, but it was an arbitration and it settled, so I

14    don't think the parties were ever disclosed and I

15    never -- and I never testified about it, but it was --

16    it was an infringement case.

17         Q    A patent infringement?

18         A    Yes.

19         Q    And when did that occur?

20         A    Actually, you know, it might have been

21    trade dress.  It might have been trade dress and

22    potentially patent, as well, but I don't recall the

23    details of that.

24         Q    I'm guessing if it was an arbitration,

25    it probably wasn't a patent case.

1          A    Well, there was -- maybe it may not have

2    been, but I -- I'm pretty sure that it went through --

3    the damages piece -- it was just the damages.  It was

4    not whether it was a valid patent or not.  It was an

5    infringement case involving a retailer.

6          Q    And when was that?

7          A    I think we did that case about -- I

8    would say about four years ago.  I can recall a case

9    again that settled -- it never actually got to court --

10   that involved failure to -- to register patents in

11   areas that had been designated that the lawyer was

12   to -- was to register this patent in other -- other

13   countries.  So there were -- there were damages

14   relating to that failure, which was a malpractice case,

15   but it was also strictly a patent that hadn't been

16   filed -- or hadn't been -- the applications hadn't been

17   filed in the proper places and so there was the

18   potential for infringement.  Those are two I recall.  I

19   can recall lawyers in a couple of others.

20         Q    Before you -- when was that -- the last

21   one you were discussing, the failure to register

22   patents elsewhere?  When did that occur?

23         A    That's been a while ago.  I would say

24   maybe 10 -- 10 years for that particular case.  I've

25   done a couple of lost -- damages cases involving

1   patent -- patent infringement cases with Tim Martin,

2   who's not practicing anymore.  I think three or four.

3               So it's something that I do -- that I do

4   fairly -- it's not uncommon to do it.  I don't do it

5   all the time.  It's not something I do day in and day

6   out, but, like most of the things I do, I do it on --

7   on a regular basis, it comes up and sometimes it comes

8   up in spurts and I'll do a bunch of them and then I

9   won't do some for a few years and then I'll have a case

10  come up again.

11              Q    And the case with respect to the failure

12  to register the patents, was that a court case?

13              A    I'm not sure they ever actually filed.

14  I think that the claim was made and it got resolved.

15  There may have been a draft complaint that I don't

16  think had been filed.  I think the parties had hoped to

17  settle it and we were not disclosed, even, in that

18  case.

19              Q    So have you ever testified in front of a

20  jury in a patent case as to what a reasonable royalty

21  should be?

22              A    I don't recall if -- if the reasonable

23  royalty cases got to trial or not.

24              Q    So you can't recall how many times

25  you've testified in front of a jury in a patent case

1  opining on a reasonable royalty?

2          A    I don't recall.  I don't recall.  I just

3  don't recall whether -- it wouldn't surprise me if we

4  had gotten to -- to trial, but 95 percent -- 90 to

5  95 percent of what we work on settles before it goes to

6  trial, so I just don't know.

7          Q    It sounds like, from what we were just

8  discussing, you've been an expert in prior legal

9  malpractice cases; right?

10          A    Yes.

11          Q    About how many legal malpractice cases

12  have you appeared in or been an expert in?

13          A    I couldn't give you a count.  It's

14  certainly been a number.  On both -- both sides of

15  plaintiff and defense, but I -- I would say it's more

16  than 20, but that's an estimate and I don't know that I

17  can refine that.

18          Q    It also sounded like you testified there

19  was at least one other malpractice case that involved

20  patents and obviously, this one.  Other than those two,

21  are there any other malpractice cases that you've been

22  an expert in that have involved patents?

23          A    None that are coming to my mind, but

24  that doesn't mean that there haven't been.  I don't

25  recall any as I'm sitting here.

1    Q    Are you familiar with patent damages

2  case law?

3    A    Yes.  And when we do a case, we refresh

4  our memory on it because things change and it's a legal

5  issue and so we like to have counsel tell us what the

6  current law is and what the current case law that

7  they're looking at specifically for -- for their

8  particular case.  And I almost get out the -- get out

9  the professional literature and look at it again before

10  we do the case.

11    Q    Are you familiar with the Georgia

12  Pacific case?

13    A    Yes.

14    Q    What's your understanding of the Georgia

15  Pacific case?

16    A    As I recall, they put some tests

17  together that you were supposed to meet to -- a list of

18  tests that you go down looking at and it's required.

19  And as I recall, there's been some activity in terms of

20  case law recently that have put together some other

21  criteria that you need to look at in those kinds of

22  cases, but I haven't had the need to look at those in

23  detail at this point.  But I'm aware that they're out

24  there.

25    Q    Have you ever applied the Georgia

1   Pacific factors in assessing damages related to a

2   patent?

3            A     I have applied those factors.

4            Q     Did you -- I'm sorry.

5            A     Interestingly enough, not just in a --

6   in a patent case.  They came up in something else where

7   the -- the lawyer felt they were applicable, but, yes,

8   I have applied them.

9            Q     Did you apply them in this case?

10           A     No.

11           Q     Have you ever analyzed a reasonable

12  royalty rate for a patent in the context of a

13  hypothetical negotiation?

14           A     I don't recall.

15           Q     I guess, to me, your answer is a little

16  unclear.  Is it that you may have, but you just don't

17  recall, or you don't know or you didn't?

18           A     My answer is that I may have, but I

19  don't recall a specific instance of it.  It wouldn't

20  surprise me at all that we would have done that because

21  we frequently work in cases that are -- that are

22  being -- the damages are being negotiated.  There's an

23  issue involved.  Often, liability has been

24  acknowledged.  And so the -- we're assisting with

25  supporting calculations, so it wouldn't surprise me,

1    but I don't have a specific recollection of a situation

2    that involved that.

3         Q    So I'm guessing you didn't analyze a

4    reasonable royalty rate in this case in the context of

5    a hypothetical negotiation between Mr. Wyers and one or

6    more of his competitors?

7         A    We did not.

8         Q    Ms. Harper, have you, to your -- to your

9    knowledge, your opinions ever been excluded by a court?

10        A    Not -- not in any material degree.

11   There have been some motions in limine or things like

12   that where some piece of what I was going to talk about

13   was disputed by the parties and some piece, the judge

14   said I couldn't talk about some piece of this or that,

15   but I've never been excluded from testifying in a case

16   that I'm aware of.

17        Q    To move on to your report, which is

18   Exhibit 101, what were you asked to do in this case?

19        A    We were asked to calculate the damages,

20   interest, and -- and interest -- basically, do the

21   present value of those -- of those damages through an

22   assumed trial date, using data that the -- the

23   plaintiffs intend to present in support of -- of the --

24   of -- as part of the facts and circumstances and the

25   legal basis for their claim.

1       Q     If you'd turn to page 4 of Exhibit 101,

2   under "Approach," if you could take a look at that.

3       A     Yes.

4       Q     Is that a fair characterization of what

5   you were asked to do in this case?

6       A     This is a -- I would say an expansion of

7   what I just said.  This gets into some -- the details.

8   I gave you a more -- a higher level of what we were

9   asked to do, but this starts to get -- starts to get

10  into the details of what we were asked to do.

11      Q     Were you -- were you asked to do

12  anything else for which you did not render an opinion

13  in this case?

14      A     I was asked to look at Ms. Salters'

15  report.  And -- and I was asked to be here and be

16  deposed.

17      Q     Fair enough.  I guess, did Mr. Wyers ask

18  you to opine on something in preparation for your

19  report that you ultimately did not render an opinion

20  on?

21      A     No.

22      Q     We discussed a little earlier that

23  you -- some of your associates helped with the

24  preparation of the report.  Did Mr. Nelson or any --

25  anybody at Mr. Nelson's firm help with the preparation

1   of the report?

2              MR. NELSON:  I object to the extent it

3   calls for counsel's mental impression.  You're not

4   entitled to those under the rule.

5              MR. PLUTA:  It just calls for a

6   yes-or-no answer.

7        A    Could I hear the question again, please?

8        Q    (BY MR. PLUTA)  Sure.  I just asked

9   whether Mr. Nelson or someone at his firm helped you

10  draft your report.

11       A    I would say they didn't help us draft

12  the report, no.

13       Q    Did you have conversations with

14  Mr. Nelson about the report?

15       A    We did.

16       Q    I'm sorry.  Let me -- let me clarify my

17  question because it was kind of vague.  Did you have

18  conversations, while you were preparing your report,

19  with Mr. Nelson about the contents of the report?

20       A    Yes.

21       Q    About how -- how many conversations did

22  you have?

23       A    Maybe three.  Two or three times.

24       Q    And what did -- what did Mr. Nelson --

25  was it Mr. Nelson that you dealt with exclusively at

1   the Semler firm?

2          A    We did also talk to Mr. Semler.

3          Q    And when did -- what was Mr. Nelson's

4   input into the preparation of the report that you

5   discussed with him?

6               MR. NELSON:  Same objection.  Under Rule

7   26, you're not entitled to counsel's mental

8   impressions.

9               MR. PLUTA:  I guess I'll just say she

10  relied on e-mail communications from you --

11              MR. NELSON:  Yes.

12              MR. PLUTA:  -- to her and so I -- I

13  guess I'd argue that it would go to conversations that

14  you also had.  So that's my position.  But I'll move

15  on.

16              MR. NELSON:  Sure.  And I understand.  I

17  mean, you're obviously allowed to ask her about any

18  assumptions.  Just not about counsel's mental

19  impressions.

20          Q    (BY MR. PLUTA)  So in -- did you have --

21  you said you had conversation -- or conversations with

22  Mr. Semler, as well?

23          A    Mr. Weiss did.

24          Q    Okay.  So, in your report, there's --

25  and we'll get to the substance of them, but there's, as

1   you know, schedules attached with numbers.  Did you

2   actually crunch the numbers, for lack of a better word,

3   and prepare the schedules to your report?

4          A    No, I did not.

5          Q    Was that -- did Mr. Weiss do that?

6          A    I thought I had described that earlier.

7   Mr. Weiss, Ms. Klos, and Ms. Morgan all contributed to

8   the schedules.

9          Q    Okay.

10          A    I had drafted the report.  I had

11   discussed with them what the schedules should contain

12   and when the report was -- when it had been finalized

13   after -- after I had provided the draft, I reviewed the

14   final product.

15          Q    If you can turn to Attachment 1, which

16   is the list of documents received and obtained.  Other

17   than the documents listed in Attachment 1, did you

18   review any other documents during your engagement in

19   this matter?  I suppose you also mentioned the Salters

20   report.  So other than the Salters report and those

21   listed in Attachment 1, did you review any other

22   documents during your engagement in this matter?

23          A    I don't believe so.

24          Q    Are all the opinions that you intend to

25   present at trial contained within your report, Exhibit

1    101?

2              A     To the extent that they relate to the

3    work that we have done, I believe that they are.  To

4    the extent that I was asked to look at Ms. Salters'

5    report, those opinions might not be -- or would not be

6    contained in this report.

7              Q     Do you intend to issue a supplemental

8    report in view of Ms. Salters' report?

9              A     I haven't been asked to issue a

10   supplemental report.  I haven't been asked to include

11   in a supplemental report the schedules that I brought

12   for you this morning.  So it's possible I could be

13   asked to issue a supplemental report, just transmitting

14   those schedules or to address Ms. Salters' report.  I

15   don't -- I don't know.  At this point, I haven't been

16   asked to do either.

17             Q     Okay.  Did you arrive at any other

18   opinions during the course of your preparation of your

19   report in this case, besides those given in your

20   report?

21             A     Well, to the extent that -- that the

22   supplemental schedules update my report, I have -- I

23   have revised the total numbers based on the -- the

24   mechanical error that we had in assembling the numbers.

25                   I also, in preparing for this

1    deposition, noted that we hadn't been asked to include

2    the -- the present value of the legal fees that

3    Mr. Wyers had paid in the first scenario, and I

4    couldn't think of a reason why those wouldn't

5    appropriately be there.  And so I had included -- I had

6    included them in a Supplemental Schedule 1.  It was

7    already in -- in the royal -- in the -- in the second

8    Scen -- Scenario 2.  It was already in Scenario 2.

9    It's now included in Scenario 1, as well.  The numbers

10   haven't changed at all.  They've just been added to

11   that damage.  The Scenario 1 damages.

12            Q    You said you were not asked to do that,

13   but you did it anyway?

14            A    I hadn't been asked to do that

15   initially, and when I was going through the schedules

16   in Ms. Salters' report, I was looking at it, I thought

17   to myself that it didn't make sense to me that the --

18   those damages wouldn't be part of the Scenario 1

19   damages, so I asked Mr. Nelson if he would like me to

20   include those amounts in there and he directed me to

21   include them.

22            Q    So focusing on the time period prior to

23   your submission of Exhibit 101, had you formed any

24   opinions related to this matter that are not expressed

25   in your report?

1          A     I don't believe any that I've -- I would

2     be testifying about.  Not that I recall.

3          Q     You state in your report that damages

4     under the first scenario as you define are 15,113,000

5     rounded, assuming the infringing product is sold in

6     15,000 stores, or 18,163,000 rounded, assuming the

7     product is sold in 20,000 stores.  Is that an opinion

8     you are giving in this case?

9          A     Well, it will be an adjusted opinion

10    because we -- but -- but the -- the substance of the

11    approach hasn't changed.  But we did not link the

12    Schedule 3 properly -- the data for Schedule 3, which

13    changes Schedules 1, 2, and 2A, I think.

14         Q     Your opinion is not changing.  It's just

15    some of the math as reflected in the new schedules that

16    Salters has pointed out, you're supplementing?

17         A     Correct.  But the -- the intent is still

18    the same and, in fact, you can see the numbers on

19    Schedule 3.  We just linked it improperly.

20         Q     And similarly, for under the second

21    scenario, in which you find 21,820,000, assuming the

22    infringing product is sold in 15,000 stores, or

23    24,870,000 rounded, assuming the product is sold in

24    20,000 stores, with the caveat that the schedule will

25    change in view of Ms. Salters' pointing out the math

Page 39

1    error --

2            A    Uh-huh.

3            Q    -- is that an opinion that you're giving

4    in this case?

5            A    Yes.  And -- and just to be clear, back

6    on Schedule 1, the -- the revised schedule includes

7    this out-of-pocket court-assessed costs element of

8    damages now, which wasn't there before.  So that is a

9    change.

10           Q    I'm sorry.

11           A    A slight change of approach.  So if you

12   look at Schedule 1, we've added to Schedule 1 the exact

13   same damages that are on Schedule 2 for the out-of-

14   pocket court-assessed costs.

15           MR. PLUTA:  Let me mark those now, I

16   guess.

17           (Exhibit 106 marked.)

18           Q    (BY MR. PLUTA)  I've handed you what's

19   been marked as Exhibit 106, which I believe is your

20   Supplemental Schedule 1, 2, and 3.  I'm sorry.  Could

21   you basically tell me what you just told me so we can

22   put it in the context of the exhibit?

23           MR. NELSON:  Before you do that, I just

24   want to interrupt.  This is Exhibit 106?  We went from

25   101 to 106?

1          MR. PLUTA:  I premarked some other ones

2    before you brought this in.

3          MR. NELSON:  Got you.  Thanks.

4          A    Exhibit 106 is the -- our -- is a

5    complete set of the schedules that were attached to our

6    report, but revised to reflect two changes.  One is

7    the -- the interest numbers that were overstated that

8    we corrected.  And the other one is the addition of the

9    out-of-pocket court-assessed costs to Supplemental

10   Schedule 1.  If the -- if the schedule itself changed,

11   then the schedule number has been changed to say

12   supplemental.  So Supplemental Schedule 1 changed,

13   Supplemental Schedule 2 changed, but Schedule 2A did

14   not.  Schedule -- I think it's 2B -- yeah.  2B did not

15   change.  And Schedule 3 is reflected as Supplemental

16   Schedule 3 because it did change.

17          Q    (BY MR. PLUTA)  And how did Schedule 3

18   change?

19          A    Schedule 3 changed because we had picked

20   up in -- in the interest compounding, we had added the

21   interest and also had it in the cumulative column, and

22   what the numbers should have reflected is the total of

23   the -- the royalties, the 11,310,000, the royalty

24   column before the 20,000 stores, for instance, plus the

25   cumulative interest number of 1,176,157.  And instead,

Page 41

1   some of that interest had been added to the royalty

2   number that was picked up.  So I apologize for that

3   error and appreciated Ms. Salters letting us know about

4   it.

5         Q    So just to summarize, in the original

6   Schedule 3, under the 15,000 stores column, the total

7   lost in future royalties including interest totaled

8   10,162,592 and in that same column in Supplemental

9   Schedule 3, that now totals 9,357,876?

10        A    Correct.

11        Q    And likewise, the $20,000 -- sorry --

12  20,000 store column, under total loss in future

13  royalties including interest, the number is 13,212,315,

14  and under Supplemental Schedule 3, it's now 12,477,157?

15        A    Correct.

16        Q    Okay.  We can put that aside for now and

17  go back to 101.

18        A    Okay.

19        Q    I guess -- I suppose we'll maybe keep it

20  handy because I guess we'll work with both schedules

21  when we dig into those.

22        A    Okay.

23        Q    And just to get it on the record, you're

24  not opining in this case that defendants committed

25  malpractice during the course of their representation

Page 42

1   of Mr. Wyers, are you?

2          A    I do not have an opinion on that.  That

3   would be a legal opinion.  I'm not a lawyer.

4          Q    Okay.  Go back to page 1 of Exhibit 101.

5   Let's look at the Procedures Performed section of the

6   report.  You state, "The procedures performed to date

7   are summarized below," and we'll go through those.  And

8   I believe you mentioned you've reviewed Ms. Salters'

9   report, prepared the supplemental schedules, and did

10  some preparation for the deposition.  Have you done

11  anything other than those activities since submitting

12  this report?

13         A    I have not.

14         Q    Have you reviewed any depositions in

15  this case so far?

16         A    No.

17         Q    So No. 1 under procedures performed

18  says, "Obtain background data from counsel."  Is that

19  background data that you obtained from counsel

20  reflected in the background section of your report on

21  pages 1 through 4?

22         A    Yes, it is.

23         Q    Is there anything else other than the

24  background section -- and of course, the documents that

25  you considered in Attachment 1, that counsel provided

Page 43

1    you that's not reflected in your report?

2              MR. NELSON:  Same objection.

3              MR. PLUTA:  Sorry.  That was probably --

4    well, I know your objection because I think it was a

5    pretty unclear question.

6         A    I was going to ask if I could hear --

7    thank you.

8         Q    (BY MR. PLUTA)  It was also a very long

9    question.  So other -- other than the background

10   section in your report, pages 1 through 4, the

11   documents listed in Attachment 1, was there any other

12   background that you were provided that's not included

13   in your report?

14             MR. NELSON:  That is my objection.  The

15   same one under Rule 26.  The scope of discovery isn't

16   broad enough to include counsel's mental impressions.

17        A    So I probably should hear that again to

18   make sure I'm not violating that.

19        Q    (BY MR. PLUTA)  Sure.  Other than the

20   background section of your report, the data that was

21   provided from counsel and the attachments -- I'm

22   sorry -- the Attachment 1, which was the documents

23   considered, is there any other background that you

24   received from counsel that is not included in the

25   report that -- that you intend to opine upon?

1          MR. NELSON:   Same objection.

2     A    I don't believe so.

3     Q    (BY MR. PLUTA)  So I understand

4  Mr. Nelson's objection with respect to mental

5  impressions of counsel, but you're not going to rely on

6  any of those impressions to offer any opinions in this

7  case; right?

8     A    I'm not saying that there were or there

9  weren't.  I mean, I testified about that.  But the

10  basis for our opinions and the work that we did is

11  included in the report and in the documents that --

12  that we reference and I think have been provided to you

13  as -- as I recall.  But, then, I have not provided

14  opinions that I might be asked to provide relating to

15  Ms. Salters' report and I have provided you with the

16  updated information.

17          So when you say "report," if we could

18  include that in -- in the report -- or do you want to

19  keep it separate from the report -- when you refer to

20  the report, are you referring to Exhibit 101, or are

21  you referring to 101 as changed by 106?

22     Q    I'll just include 106 as a separate

23  exhibit right now, but understood that you're offering

24  that as a supplemental --

25     A    Okay.

Page 45

1          Q    -- analysis.

2          A    Okay.

3          Q    Okay.  So just -- it appears -- when I

4    read the background of the report, it appears that it's

5    simply a recitation of the allegations of the

6    complaint -- amended complaint.  Sorry.  Is that a fair

7    characterization of the background section?

8          A    That's correct.

9          Q    And just to clarify, you have no

10   independent knowledge with respect to whether the

11   allegations in the amended complaint are true or not;

12   correct?

13         A    That's correct.  And that's -- as we say

14   in the report, we understand the liability is disputed

15   and the facts and circumstances and the legal

16   parameters will be decided by the trier of fact.

17         Q    Okay.  No. 2 in Procedures Performed is

18   read the documents listed in Attachment 1 of this

19   report.  I'm going to hand to you what has been

20   previously marked as -- I'm sorry -- that I marked as

21   Exhibits 102 through 105.  You can take a look at

22   those, but I'll represent to you that they're the

23   e-mails that are listed in Attachment 1 of the report.

24   I'm sorry.  I gave you all three copies.

25         A    You did.

Page 46

1          Q     Let me lighten your load here a little

2     bit.

3          A     You gave me two of those.  Do you want

4     this one back?

5                Would this be a good time to take a

6     short break?

7                MR. PLUTA:  Absolutely.

8                (There was a recess taken from 10:13

9     a.m. to 10:27 a.m.)

10         Q     (BY MR. PLUTA)  Before the break, I

11    handed you Exhibits 102 through 106.  Can you confirm

12    for me that those are the e-mails that you reference in

13    Attachment 1 to your report?

14         A     I think you meant 103 -- or 102 through

15    105.  I already had 106.

16         Q     Yes.

17         A     I think we had them in maybe a slightly

18    different sequence, but I believe this is -- I believe

19    those are the e-mails that we received.

20         Q     Okay.  And going back to the Procedures

21    Performed section of your report, the third item is

22    analyze the available information in light of a factual

23    situation.  And I think you already confirmed that your

24    analysis is contained within the report and the

25    supplemental schedule you produced today.  Did you --

1   did you examine defendants' answer at all in this case?

2          A    I don't believe we looked at it in this

3   case, no.

4          Q    Did you examine any documents produced

5   by defendants?

6          A    I don't believe so.

7          Q    Did you ask for additional documents

8   from either Mr. Wyers or the Semler firm?

9          A    I think to the -- only to the extent

10  that we -- I think we received something on the

11  interest calculation and the -- the rates that had been

12  used in the underlying case.  In the initial -- initial

13  litigation.  I don't believe there was anything else

14  that we asked for.

15         Q    And that information that you were just

16  referring to, is that reflected in Exhibit 104?

17         A    Yes.

18         Q    And No. 4 under Procedures Performed is

19  summarize the findings and the conclusions in the

20  report and the related schedules.  And -- strike that.

21              Did you review plaintiffs' financial and

22  accounting records?

23         A    No.

24         Q    Why not?

25         A    It wasn't what we were asked to do.  We

Page 48

1   were asked to take certain information and -- and take

2   that information as being assumed and to calculate the

3   damages assuming that those numbers will be accepted by

4   the trier of fact.

5           Q    Did you ask for the plaintiffs'

6   financial and accounting records?

7           A    No, we did not.

8           Q    Do you doubt that those records would

9   have been available to you had you asked for them?

10          A    We were asked to -- to do a limited

11  scope of work and -- and to try to keep the costs down,

12  so -- and I don't think they were necessary for what we

13  were asked to do, so I think it's possible that we

14  would have been told that we didn't need those for what

15  the scope of -- for -- based on the scope of our work.

16  I don't know that they exist.  I haven't -- I have no

17  knowledge that those records don't exist, but -- but I

18  don't know anything about them.

19          Q    What -- I think you testified that you

20  would have been told that they weren't necessary for

21  what you were doing.  Is that fair?

22          A    I think that is fair.  I think that

23  it -- and I would agree with that.  For what we were

24  asked to do, I didn't need those records.  I was asked

25  to do a specific task, assuming certain numbers and

1    certain protocol for interest calculations and -- and

2    sources of data.  And of course, when we do this type

3    of work, we're always looking at it to see if it makes

4    sense to us.  And -- and what -- you know, what else we

5    might need to do, what we were asked to do.

6              But I didn't think that I needed -- to

7    do what I was asked to do, I did not believe that I

8    needed those records and it wouldn't have surprised me,

9    given the cost sensitivity, that we would have been

10   told that, you know -- we would have probably been

11   asked, Well, why do you want them?  And I don't think I

12   would have had a good answer for that given question,

13   because, given what I was asked to do, I didn't think I

14   needed them.

15             Q    So with respect to the -- the numbers

16   that -- or the data that you used to generate your

17   schedules, did you solely take the assumptions set

18   forth in Exhibits 102 through 105 to generate your

19   analysis?

20             A    Let me see if I -- make sure I clarify

21   the situation in my answer.  The information that we

22   were given and asked to assume was communicated through

23   those e-mails.  And we were asked to use that

24   information and we did.  But, in doing our work, we

25   always look at the data.  We look at what's there, what

1    isn't there.

2              As I said earlier, we asked for some

3    additional information and we felt that there was a gap

4    in -- in what we needed.  We always -- if it's within

5    our area of expertise, we always evaluate the

6    information that comes to us, does it make sense.

7    Are -- is what we've been asked to do logical.  Does it

8    make sense in terms of the underlying data within the

9    scope of what we were asked to do.  We always look at

10   what we're doing.  We just don't do it with blinders

11   on.

12             But we were asked to -- but all the

13   information, sort of the data came in.  I believe it

14   all came in via those e-mails or the -- through those

15   e-mails, which included responses to some questions

16   that we had.

17        Q    Is it fair to say that -- I mean, you're

18   relying on the assumptions set forth in those e-mails,

19   rather than the actual underlying data?

20        A    For the most part.  We did have some of

21   the underlying data from the original trial as it

22   related to the interest, but, otherwise, we were given

23   certain amounts and represented as -- and given a

24   representation as to what that data was.

25        Q    And that underlying data from the trial

1   was in, I think, Exhibit 104?

2         A    Correct.

3         Q    Is it your normal practice to take

4   assumptions sent to you by counsel and apply those to

5   the schedules you generate in an expert report?

6         A    We do that when we are asked to.  I

7   wouldn't say it's the most common thing that we do, but

8   there are certain cases where we -- where we're asked

9   to limit our work, where calculations need to be done,

10  the data needs to be pulled together, organized,

11  present value concepts need to be applied.  So it's not

12  something that can just be handled through a document

13  or testimony.  It needs to be -- the work that CPA's

14  and -- and other financial people do needs to be

15  applied to it.  But that are -- our scope and our role

16  is pretty narrow.  It's not uncommon, but it's not the

17  bulk of what we do.

18        Q    Is it fair to say that you -- you relied

19  on the assumptions in this case because of the cost

20  concerns?

21        A    I think that's why the approach of

22  having us work from assumptions that we were given was

23  developed and so that -- that -- that was the source of

24  it.  Did that answer your question?

25        Q    Partly.  I'll ask a follow-up question.

Page 52

1    So let's assume that cost was no concern at all.  You

2    could bill a lot of hours to this matter.  Would you

3    have liked to have looked into some additional

4    information?

5              A    I don't have a preference as to what we

6    do.  I want to do what makes sense, and in this case,

7    doing this scope of work was what made sense to the

8    client and counsel, and we could do it professionally

9    and -- and I thought the information that came out of

10   our work would be useful to the Court, which is the --

11   the ultimate test.  And so I was -- I was happy to do

12   it.

13             If I had been asked to analyze the

14   underlying information relating to those numbers, I'd

15   have been happy to do that, as well, but I don't -- I'm

16   not driving the -- the approach and the approach in

17   this case was we were asked to do what we described,

18   and that's fine with me.  I'm happy to provide that

19   service to the Court.  If I had been asked to do more,

20   I would have been happy to do that, as well.

21             Q    Have you ever performed audits for

22   companies?

23             A    I have.

24             Q    If a company came to you and told you to

25   assume that its sales were one figure and its profits

1   were another figure and that its products were sold in

2   15,000 stores, would you take that company at its word

3   with respect to your role as an auditor?

4          A    No.  It would not be appropriate under

5   the auditing standards and the -- under either what

6   they call GAAS, generally accepted auditing standards

7   or GAAP, generally accepted accounting principles.

8   Under either of those, it would be a breach of

9   professional duties.

10          This type of work falls under consulting

11   standards, not under the auditing standards, and it is

12   much more related -- it is generally defined by what's

13   needed, and that varies dramatically from case to case

14   and there are not specific rules that lay out how to

15   handle all these different situations.

16          You have to apply professional judgment

17   and consider what -- the general -- the code of conduct

18   which says you have to do appropriate work, be

19   qualified, be competent, et cetera.  I'd have to get

20   those out to go through them in more detail.  But

21   the -- there just -- they're two completely different

22   worlds.  The approach and the requirements are totally

23   different.

24          Q    Let's take a look at page 2 of Exhibit

25   101.  It's in the -- the first paragraph.  Have you

Page 54

1    seen documents that support the statement that damages

2    from the 2009 trial were later increased to a total

3    amount of approximately $8.7 million?

4         A    We had a discussion about that, and the

5    e-mails that came from Mr. Nelson, which included some

6    information directly from Mr. Wyers, that is our source

7    for that information.

8         Q    Okay.  And is the -- is that source the

9    same source for your understanding of Master Lock

10   disclosing additional pre-judgment sales?

11        A    Yes.

12        Q    Any other sources, other than those

13   e-mails?

14        A    Well, it is mentioned in the complaint.

15   It's --

16        Q    Okay.  And the complaint.

17        A    But, you know, we have supplied to you

18   absolutely everything, so it's -- it's in those

19   e-mails.

20        Q    Okay.  And I -- some of this may sound

21   repetitive, but I've just got to make my record and go.

22   And why did you cite to the amended complaint in this

23   matter for the various background rather than the

24   source documents?

25        A    We did not look at the source documents,

1   No. 1.  No. 2, it is the -- the background section

2   is -- is, typically, a summary of the facts,

3   circumstances, and the legal positions that the party

4   that we're working for intends to prove at trial.  And

5   we aren't the trier of fact.  We have to, which is

6   implicit in expert work, make an assumption unless it's

7   something that we have knowledge about and can see this

8   doesn't work, that they will, in fact, prevail at

9   trial.

10              And so in -- in connecting up the work

11  that we did -- we do with the -- with the position of

12  the party that we're working for, we typically will lay

13  out a background section and -- and it's very common

14  for it to -- the main source of it to be the complaint

15  or amended complaint or -- or response to the -- to the

16  complaint.  Sometimes, we -- it's more limited and

17  there's less information than there is here, just

18  depending on the -- on the circumstances.

19       Q    Do you know who Aaron Bradford is?

20       A    I don't.

21       Q    So I'm guessing your answer would be no

22  as to do you -- do you know whether Mr. Bradford

23  represented Mr. Wyers at the mediation conference in

24  this matter?

25       A    I don't recall a Mr. Bradford.  I don't

Page 56

1   recall that name, so I don't know what he would have

2   been doing.

3          Q    If you can take a look at page 3 of

4   Exhibit 101.  And it would be the second full

5   paragraph, starting "As a result of."  That -- are you

6   there?

7          A    Uh-huh.  Yes.

8          Q    That paragraph comes verbatim from the

9   amended complaint, doesn't it?

10         A    I'd have to check back to see if it --

11  if it was verbatim.  I don't recall.

12         Q    If you look at -- about halfway down the

13  paragraph, the sentence starts, "A determination of

14  validity through settlement or judgment would have

15  greatly enhanced the likelihood that Wyers would

16  prevail against two or three other infringers for

17  damages that collectively were comparable to those

18  awarded against Master Lock."  Do you see that?

19         A    Yes.

20         Q    What are the two or three other

21  infringers that you reference Mr. Wyers could have

22  pursued for licensing fees and royalties?

23         A    I don't recall the names of the other

24  infringers.  They're mentioned -- the names of some of

25  them are in Ms. Salters' report, as I recall.  And I

1   don't recall the names.

2          Q    Who did -- which infringers did you have

3   in mind when you wrote your report?

4          A    I didn't have any specific infringers in

5   mind.

6          Q    Did you have any knowledge of the volume

7   or amount of sales each potential licensee had that

8   would have been infringing?

9          A    No.

10         Q    Do you know whether Mr. Wyers sued or

11  licensed any of those two or three infringers

12  generally?

13         A    I don't -- at the time, no, I did not.

14         Q    Is your understanding different now?

15         A    I have some information from reading

16  Ms. Salters' report relating to that.

17         Q    When you were writing your report, you

18  had no information regarding that?

19         A    Correct.

20         Q    Do you know whether Mr. Wyers sued or

21  licensed any of -- any other defendants while the

22  Master Lock case was on appeal?

23         A    I -- I don't know.  I don't recall

24  the -- the timing.  There was some information about

25  that in Ms. Salters' report, but I don't recall the

Page 58

1    specifics of the timing or the parties.

2          Q    But that information is not in your

3    report; right?

4          A    Correct.

5          Q    Do you know of any reason that Mr. Wyers

6    could not -- did not sue or license other defendants

7    while the Master Lock case was on appeal?

8               MR. NELSON:  Object to the form.

9          A    I don't know whether he did or he did

10   not, so I can't answer your question.

11         Q    (BY MR. PLUTA)  Do any of your opinions

12   in this case rely on whether Mr. Wyers licensed other

13   defendants the patents at issue?

14         A    Not that I'm aware of.  As I said, I'm

15   assuming that this information that we were asked to

16   assume will be presented through trial, but I -- I

17   don't have specific knowledge of that.

18         Q    Is it fair to say that if one or more of

19   your assumptions aren't accepted by the trial court,

20   that you don't know how that would affect your opinion

21   in this case?

22         A    If -- if assumptions that we were asked

23   to make are -- are not accepted by the Court, then

24   changes would need to be made and depending on -- on

25   what those assumptions were and the time frames, et

1  cetera, changes would need to be made, which I can't

2  predict at this -- it would be impossible to predict.

3          Q    The last several sentences of that

4  paragraph -- I'll just read them.  Finally, the loss of

5  the appeal on the merits denied Wyers' future royalties

6  on sales by Master Lock.  These additional damages have

7  an economic damage in the range of 3 million to

8  4 million.  In addition to the lost lump sum

9  settlement, the lost jury verdict and the attorney's

10  fees -- attorney fees paid to Greenberg Traurig,

11  unquote.

12          Did you perform a calculation in this

13  case to account for future royalties on sales by Master

14  Lock?

15          A    We prepared a calculation of -- of lost

16  future royalties, which are shown in our -- in our

17  schedules.  In Schedule 3, it shows the -- the

18  royalties from 2008 through 2014.  We were asked to

19  make assumptions about -- about those royalties.  We

20  were given the time frame and the -- the pricing and

21  the volume data.

22          Q    Is it a -- is it an opinion -- is it

23  your opinion in this case that additional damages --

24  strike that.

25          Is it your opinion in this case that

Page 60

1   Wyers' future royalties on sales by Master Lock have an

2   economic value in a range of 3 to 4 million dollars?

3          A    Could I hear that again, please.

4          Q    Sure.  Is it your opinion in this case

5   that Wyers' future royalties on sales by Master Lock

6   have an economic value in the range of 3 to 4 million

7   dollars?

8          A    It's our opinion that given the

9   assumptions that we were asked to make about the -- the

10   number of stores, the sales volume, the pricing, the

11   royalty rate -- that given those assumptions, that

12   these are the royalty amounts that would be generated.

13          Q    And does that come out to 3 million to

14   4 million dollars?

15          A    No.  The royalty amounts are greater

16   than that.

17          Q    What I'm trying to do is reconcile your

18   statement here on page 3 about the 3 or 4 million

19   dollars in future royalties and sales by Master Lock to

20   your actual calculation as reflected in Schedule 3.

21          A    And I see -- I see that.  I understand

22   your question.  I think that we, in using that

23   information from the complaint, probably put that in

24   there early and didn't update it for what was the

25   actual result of our schedules.  And I did not catch

Page 61

1    that.

2          Q    So I guess which is incorrect?  The

3    schedules or your statement in the -- in your report on

4    page 3?

5          A    The -- I'm not sure that either one are

6    incorrect.  At the time that the complaint was drafted,

7    there was a belief when it was drafted that this -- the

8    number would be in the range of 3 to 4 million.  Our

9    calculations make assumptions -- using the assumptions

10   that we were given subsequently to the filing of the

11   complaint, generate a -- a much different range of

12   numbers and, in my experience, it's not very -- it's

13   not unusual at all for the complaint to identify

14   damages that change substantially after it's filed and

15   when you get the involvement of -- of people doing

16   damages -- the actual damages calculation as opposed to

17   the estimates, which are typically in the complaint.

18         Q    It generally goes up, doesn't it?

19         A    Not always.  I would say it goes up more

20   often than it goes down because I think the -- the

21   complaints are often somewhat conservative, but I've

22   seen complaints be dismissed completely.  I've seen

23   numbers go away completely.  I've seen numbers go up.

24   I've seen them go down.

25         Q    Did you account for the possibility that

1   Master Lock would simply stop selling the alleged

2   infringing product so as to not have to pay royalties

3   to Wyers?

4           A     No.  We did what we were asked to do,

5   which was given the data and the assumptions that we've

6   outlined, we did the calculations as to what the

7   damages would be, given those assumptions.

8           Q     What if -- what if Master Lock had just

9   simply stopped selling the infringing product?  How

10  would that affect your analysis?

11          A     I don't know.  I don't know whether

12  there would be any legal consequences related to that,

13  whether those consequences were a function only of --

14  of the resulting outcomes.  I do know that Master Lock

15  was selling some of the -- of the Wyers products and

16  had paid licensing fees in the past and that they --

17  the settlement offer, they planned to go forward, but

18  we weren't asked to evaluate those things.  We were

19  asked to take the assumptions that we were given and

20  assuming that those are what the trier of fact would

21  accept and do the calculations.

22          Q     In preparing your report, did you

23  consider any of Wyers' past litigations against

24  competitors to determine which competitors, if any,

25  have a license to Wyers' patents?

1        A     No.  We did not.

2        Q     Let's take a look at page 5, the

3   Analysis portion of your report.  I'd like to focus

4   first on the first scenario as you've described it.

5   Your first scenario assumes that Wyers and Master Lock

6   would have settled for 3-1/2 million.

7        A     Yes.

8        Q     Upon what assumption do you base that

9   assumption?

10       A     We based that assumption from -- that

11  assumption came to us in a series of e-mails that we

12  had produced.

13       Q     Anywhere else?

14       A     I think it probably was discussed in the

15  conversation, but it was provided to us formally in

16  those e-mails.  We didn't accept any information that

17  was just discussed.  We wanted it laid out with

18  specificity.

19       Q     So you're not relying on any

20  conversations that you had either with Mr. Semler or

21  Mr. Nelson or -- or even Mr. Wyers in this case?

22       A     No.  I think everything that we used in

23  our report to generate our schedules and opinions

24  were -- were laid out in the information provided to

25  you.

Page 64

1          Q     And the only reason you make that

2     assumption is because they were provided in the

3     e-mails?

4          A     I mean, if we hadn't been given that

5     information, we wouldn't have been able to make the

6     assumption, so I think --

7          Q     Fair enough.

8          A     I think that's correct.

9          Q     Did you perform any market analysis to

10    determine whether such a settlement number would have

11    been reasonable for Mr. Wyers at that time?

12         A     No.

13         Q     Do you have an opinion as to whether

14    such a settlement offer would have been reasonable for

15    Mr. Wyers?

16         A     No, I did not.

17         Q     Did you perform a market analysis to

18    determine whether such a settlement would have been

19    reasonable to Master Lock?

20         A     No.

21         Q     And similarly, do you have an opinion as

22    to whether you think that settlement would have been

23    reasonable for Master Lock?

24         A     I do.  Well, and I -- I mean, obviously,

25    they made -- my understanding is factually that they

1    made the offer.  So if they made the offer, I would

2    assume they would -- they thought it was reasonable,

3    so -- but I don't believe I'm going to be expressing an

4    opinion about that, but, just logically, if that is, in

5    fact, true, then they must have thought it was

6    reasonable.

7              Q    Fair enough.  Yeah.  You also assume

8    that Master Lock would have paid the settlement in full

9    on December 1, 2009.  Is that correct?

10             A    Yes.

11             Q    And upon what information do you base

12   that assumption?

13             A    I think that we just picked what we

14   thought was a reasonable date after the mediation in

15   which to complete the settlement documents and get the

16   payment made.  I'm not sure that that's in any of the

17   e-mails.  We may have just -- we may have decided that

18   is a reasonable date.

19             Q    So that was -- that was a date that you

20   decided?

21             A    I could look at the e-mails to see if

22   it's in there, whether we specifically inquired about

23   that, but I suspect when I was asked about it, I

24   suggested that we assume December 1.  A couple months

25   seemed -- would seem adequate to get that resolved,

Page 66

1  based on my experience.

2  Q  So did you consider any other forms of

3  settlement in making your analysis in your first

4  scenario?  In other words, you assume that Master Lock

5  just paid in full by December 1.  Did you consider any

6  other scenarios that Master Lock may have entered into

7  in settling with Mr. Wyers?

8  A  We did not.  We assumed that they would

9  pay cash for the offer that they made and that they

10 would do it within approximately two months.

11 Q  So you didn't consider any cross-

12 licensing arrangements that Master Lock may -- may have

13 offered or wanted to enter into with Mr. Wyers?

14 A  I'm not aware that there was any offer

15 like that.  And we didn't consider that type of an

16 arrangement.

17 Q  The next sentence -- second paragraph on

18 page 5 of Exhibit 101 says, "We calculate interest on

19 the settlement amount at a rate of 8 percent, which is

20 compounded on an annual basis from the assumed payment

21 date through the estimated trial date in this matter of

22 March 31st, 2014."

23 What's your basis for applying an

24 8 percent interest rate?

25 A  It is the statutory rate that we

1   generally use in Colorado.  8 percent compounded

2   annually.

3          Q    And why did you calculate the interest

4   through the trial date in this matter?

5          A    That's our general practice is to

6   calculate pre-judgment interest through the end of

7   trial.  I certainly -- it's something that the judge

8   will decide, but we generally provide as a convenience.

9   It's not always in our schedules for trial -- at trial,

10  I mean, because it is something that the judge will

11  order, but, usually, the parties request that we do the

12  calculation at least pretrial.

13         Q    Let's go back to Schedule 3.  I have

14  brief questions about this right now.  I don't think it

15  will matter whether we look at your Supplemental

16  Schedule 3 or the one in your original report.

17              All right.  I guess in your answers, you

18  can let me know if it does.  Did you, in generating

19  Schedule 3 -- either of them -- did you consider

20  whether the royalty rate would be different had the

21  parties settled versus whether the Federal Circuit

22  affirmed?

23         A    No.  We were asked to assume a royalty

24  rate of 24 percent, and that's what we based our

25  calculations on.

1       Q    Do you know whether Mr. Wyers had any

2  concerns about the royalty rate that he could have

3  achieved with future licensees had he settled the

4  Master Lock case at the mediation?

5       A    I'm not aware of concerns that he had.

6  We have not discussed his concerns.

7       Q    If he had had concerns about that a

8  settlement would have decreased his future royalties

9  with future licensees, would that affect your opinion

10  at all?

11       A    If he had concerns, I don't believe it

12  would affect our opinion.  Ultimately, we were asked to

13  make an assumption about the royalty rate, which we

14  did, and our opinions relate to the calculations given

15  the provided assumptions, so unless we are given

16  different assumptions, we wouldn't be affected by

17  information that we're not aware of.

18       Q    How many licensees does Schedule 3

19  reflect?

20       A    I don't know.

21       Q    Is it fair to say that if one

22  licensee -- I mean, well, let me back up here.

23            Does -- does Schedule 3 reflect any

24  licensees?

25       A    I don't know whether it affects

Page 69

1   licensees.  It's just an agreement relating to

2   royalties.  With Master Lock, it's -- I don't know.

3   This is what we were asked to assume was that there

4   would be this amount of sales that would generate this

5   level of royalties.  And I don't know the underlying

6   details of what agreement there would be and with whom.

7        Q    Let's assume that Schedule 3 reflects

8   the sales of five licensees.  How would your opinion

9   change if one of those five licensees decided not to

10  sell the product?

11       A    I don't know.  I haven't made that

12  evaluation.

13       Q    Wouldn't it have -- wouldn't it go down?

14       A    Not necessarily.  It might be that those

15  sales would be picked up by one of the other licensees

16  or a new licensee.  It would be replaced by a new

17  licensee, I don't -- I don't know.

18       Q    Does Schedule 3 reflect the licensing of

19  one patent or multiple patents?

20       A    I'm not clear on the -- whether -- what

21  the underlying assumption that we were given assumes

22  relating to those patents.  I assume that they will be

23  presented as part of the support for the assumptions

24  that we were given or that type of thing will be

25  clarified, but we don't -- we don't have information

Page 70

1    about the underlying patents.

2            Q    Would it matter to your analysis whether

3    there was one patent at issue or more with respect to

4    calculating the royalties awarded with respect to

5    Schedule 3?

6            A    I'm not -- I'm not aware of what

7    royalties were assumed to generate these.  Whether it

8    was one patent or a combination of patents.

9    Ms. Salters talks about a number of patents and --

10   and -- and how they related to various situations and

11   licensees, but I don't -- I wasn't given that type of

12   information in -- in the assumptions I was asked to

13   make in order to make the calculations I was asked to

14   make.  So I don't know.

15           Q    Did it occur to you to ask Mr. Wyers

16   or -- or Mr. Nelson what data underlied those

17   assumptions?

18           A    It always occurs to me to ask questions

19   because I'm always asking questions, but I was asked

20   specifically in this case to make the assumptions, to

21   apply the assumptions that I was asked to make, and to

22   limit my work to that -- to that.  Making those

23   calculations, given the assumptions that I was given.

24                And so while I could have asked all

25   kinds of questions and done other things, that wasn't

1   what I was asked to do in this case.  And I've tried to

2   be very clear about what we were asked to do, so that

3   we are not misrepresenting in any way what we did.  We

4   did not go beyond what we were asked to do.

5               And I wanted to add to that, whenever we

6   were asked to do anything, we're always thinking about

7   what we're doing, but in this case, we did not expand

8   the scope of investigation beyond looking at the

9   information that was given to us and understanding it

10  and getting clear on it, but we didn't go beyond that.

11      Q    You previously testified you had worked

12  on reasonable royalties for patents in the past, I

13  believe.  At least that you recall at some general

14  level.  Isn't it important to a reasonable royalty

15  analysis to know which patents you're applying those

16  royalties to?

17      A    In a reasonable royalty case, we do

18  completely different work than what we have done here.

19  This is not -- we were not asked to assess a reasonable

20  royalty.  We were asked to take assumptions that we

21  were given and apply them in a -- in a reasonable and

22  clear way, understanding the -- the data that we were

23  given and relating it properly to each other.  We were

24  not asked to do a reasonable royalty evaluation.

25      Q    In your first scenario, was the damage

1   calculation for the first scenario a fairly simple

2   damage calculation?

3           A     I think it -- it -- the piece that

4   related to the potential settlement was extremely

5   simple in that we took the settlement and adjusted it

6   for interest.  We then added in the royalty information

7   and we have now added in the cost of the -- the Court-

8   awarded costs and fees and costs, but it was -- it

9   really wasn't too much to do in terms of the

10  settlement.  We were given that amount.  We needed to

11  look at the -- the periods and through the assumed

12  trial date to get the interest.  We then needed to pick

13  up the royalties from Schedule 3, which were the same

14  for both scenarios.  The royalty calculation was more

15  complex.  But it -- overall, these are relatively

16  straightforward calculations.

17          MR. PLUTA:  Just hold on one minute.

18  Let's go off the record for a minute.

19          (There was a discussion off the record.)

20          Q     (BY MR. PLUTA)  Okay.

21          A     When I say "relatively straightforward,"

22  I say relatively straightforward in comparison to many

23  of the things that we do, which are incredibly more

24  complicated than this.

25          Q     Right.

1        A    But I wouldn't say that it was something

2   that, you know, anybody could just pick up a calculator

3   and a pencil and do.

4        Q    Understood, but with some -- some of

5   the -- somebody that does this for a living --

6   essentially, you were given a limited number of

7   assumptions and you plug those into some formulas and

8   generate a number?

9        A    Correct.  In summary.

10        Q    In summary.  So going back to the first

11   scenario, just explain to me how the first scenario is

12   reflected in your schedules.

13        A    The first scenario shows up on

14   Schedule -- on Schedule 1.

15        Q    Okay.

16        A    And it has the -- the settle -- the lost

17   settlement damages as the first element and then it

18   picks up the royalty amounts off of Schedule 3.  And

19   then the schedule we brought you today, it also now

20   picks up the out-of-pocket court-assessed costs from

21   Schedule 2B.  And then all of this -- these numbers are

22   present valued and it adds them up so that they go --

23   the present value goes through the end of trial, which

24   we assume is March 31st of 2014.

25        Q    So why did you include the total lost on

Page 74

1    future royalties in your Scenario 1?

2         A    Because we were asked to.

3         Q    Any other reasons?

4         A    No.

5         Q    Let's flip back to page 5 of your

6    report, Exhibit 101, and take a look at the second

7    scenario.  It states, "Our determination of damages

8    based on the second scenario was completed in three

9    separate calculations using the information provided in

10   various assumptions."

11        So can you please explain to me the

12   three calculations that you performed.

13        A    Sure.  So the first thing we did was

14   assume that the award would be the amount that we were

15   given of 8 million -- let me see if that's the adjusted

16   number.  Yeah.  The total monetary judgment of -- was

17   8,643,135.

18        We then applied the -- the prime rate to

19   that through the 7-22-10 date, and then, after that

20   date, we picked up the 8 percent compounded annually,

21   the pre-judgment amount.  And as shown on Schedule 2A,

22   we just add the -- the annual interest to the amount

23   that we were asked to assume, which is explained, I

24   think, in the e-mails.

25        There was an additional judgment and

Page 75

1   then there was some adjustments to that award through,

2   I believe -- through court order, and the ultimate

3   amount that we were given and asked to assume was the

4   amount that we show on schedule -- at the top of

5   Schedule 2A, 8,643,135.

6        Q    I'm sorry to jump around.  One question

7   on this first scenario.  The 8 percent interest rate --

8        A    Yes.

9        Q    -- was that for pre- or post-judgment

10  interest?

11       A    It's -- I believe it's -- it's

12  pre-judgment because it goes through the end of trial.

13  We don't usually calculate post-judgment interest.

14  Although we can if we're asked to, but we don't usually

15  do post-judgment.

16       Q    Okay.  I think the reason -- and maybe

17  it's just a typo, but the Scenario 1 schedule --

18  Schedule 1 says post-judgment interest rate, 8 percent.

19  Is that --

20       A    It does.

21       Q    Is that a typo?

22       A    That is a typo.

23       Q    It should be pre-judgment?

24       A    Yes.

25       Q    That's fine.

1          A     I mean, it's post-judgment as it relates

2     to the underlying trial, but it's -- so that may be why

3     it's called post-judgment, but it's -- it's

4     pre-judgment in this -- in this situation.

5          Q     So, yeah, I guess that brings up a

6     question.  Are you applying that interest rate to

7     post -- the post-judgment concept of, you know, they

8     settled and then you -- that's the judgment, so to

9     speak, and then you're going out afterwards?

10         A     Correct.  And we go through 7-22-10 with

11    the interest.  With the post-judgment amount that I

12    think the Court awarded and then starting at 7-22-10,

13    we do -- we're -- in this case, in effect, and so we're

14    back to pre-judgment under the Colorado statute.

15         Q     I'm sorry.  It may be I -- I was still

16    on Scenario 1.  I had a follow-up question.

17         A     Oh, I'm sorry.  I'm sorry.

18         Q     Sorry about that.

19         A     I thought you'd asked me to look at

20    that.

21         Q     So still staying on Schedule 1, the

22    post-judgment interest rate, 8 percent, I guess I want

23    to understand your -- your thought here.  You assumed

24    that the parties settled for 3-1/2 million dollars.

25    Did you then calculate -- would that be, I guess, a

1    judgment of sorts?  Was that your thought?

2         A    It really -- that really should be

3    pre-judgment interest because the claim is being made

4    that -- in this assumption, the assumption is that --

5    that that settlement amount would have been made --

6    would have been paid as of October 1st of 2009.

7         Q    Okay.

8         A    So we assumed it would have been paid

9    December 1st, 2009.  But we -- we have annual

10   interest through 10-1.  I'd have to look at the

11   underlying schedules to see if we picked up from 12-1

12   or 10-1.  I can't tell from here, but it should -- it

13   should have been 12-1.  I'm going to assume it is 12-1.

14   And so that would be -- that becomes pre-judgment

15   interest going forward.  I think that should have been

16   called pre-judgment interest because it's in this case

17   from the date we assumed that the mediation settlement

18   should have been paid.

19        Q    That was my clarification.  Pre-judgment

20   interest with respect to this case versus --

21        A    Right.

22        Q    -- post-judgment interest with respect

23   to the underlying case?

24        A    Right.  Because this is a settlement.

25   This was a settlement offer that we were asked to

1   assume Mr. Wyers might have -- would have accepted had

2   he been given better advice.  And that's part of the

3   complaint, as we understand it.  And so if that's a --

4   a claim in this case and it should have been paid back

5   at the time of the offer, then we're putting

6   pre-judgment interest on that up through the time of

7   trial.

8               Did I muddy the waters, or did I clear

9   that up?

10          Q    I think it's cleared up.  I guess I'll

11  go back and look at it later, but we can move on to

12  Scenario 2.

13          A    Okay.

14          Q    And before I interrupted, you were

15  explaining the methodology of -- of the first

16  calculation.  I think we got through that.

17          A    Okay.

18          Q    So what about the second calculation?

19  The second scenario.

20          A    The -- the second calculation is in the

21  Scenario 2 relates to the -- the royalties and it's the

22  exact same calculation as it is under the first

23  scenario.  The same numbers are being picked up from

24  Schedule 3.

25               We had already included here the

1   out-of-pocket court-assessed costs.  Those had already

2   been included on Schedule 2 for scenario 2.

3          Q   You -- you make the statement that Wyers

4   would -- Wyers would either have the exclusive right to

5   sell the infringing products at a 24 percent profit

6   margin or to continue to collect 24 percent royalty

7   from licensees.  Upon what do you base that assumption?

8          A   I believe that was -- I believe that's

9   in the e-mails that we received that -- that it -- the

10  24 percent would either be profit that he would make or

11  that he would be collecting 24 percent royalty.

12         Q   So you're, basically, assuming that

13  subsequent trial courts would have awarded Wyers the

14  same royalty rate of 24 percent against other

15  infringers?

16         A   We're assuming -- we aren't assuming

17  that.  We were asked to make that assumption.  We were

18  asked to use that rate.  And we are making that -- we

19  are accepting that request.  We aren't making an

20  underlying assumption relating to it.

21         Q   Understood.  Do you think that's a

22  reasonable assumption that you were provided with?

23         A   I have not assessed that.

24         Q   Did you evaluate the damages methodology

25  used in the Myers versus Master Lock case?

Page 80

1        A    I did not.

2        Q    Did you consider applying Master Lock's

3   royalty rate to your calculations as an alternative?

4        A    No.

5        Q    Do you know what Master Lock's royalty

6   rate was?

7        A    No.

8        Q    Would it surprise you to learn it was

9   2-1/2 percent?

10       A    I did know that from Ms. Salters'

11  report.  It was obviously disputed.  It wasn't the rate

12  selected by -- I think it was a jury.  But we were not

13  asked to make that assessment.  We were not asked to

14  evaluate it.  We were asked to make calculations given

15  certain assumptions that we were provided with.

16       Q    So you've -- you've not performed any

17  calculations under an alternative scenario where a

18  2-1/2 percent royalty rate would apply to the other

19  assumptions you've made?

20       A    No.  We were not asked to do that and

21  have not done that.

22       Q    Do you know what Master Lock based that

23  2-1/2 percent rate on?

24       A    No, I do not.

25       Q    Would it affect your opinion in this

1    case if that rate was based on an agreement between

2    Wyers and Master Lock?

3           A     No.  Because I don't have an opinion

4    relating to the actual rate.  I have an opinion

5    relating to the calculations that we performed based on

6    the assumptions we were asked to make.

7           Q    You performed calculations in this case

8    and you were provided assumptions.  And I think I hear

9    you saying you don't have any opinions beyond the

10   assumptions that you were provided; correct?

11          A     No.  That's not quite what I said.  What

12   I said is that we were given assumptions and asked to

13   use them to make calculations, and our opinions relate

14   to the calculations that were made using those

15   assumptions.  We have -- we were not asked to

16   investigate the assumptions that we were given.

17          Q    So what I'm having a hard time

18   understanding is why wasn't what you did in this case a

19   mathematical exercise?  Taking assumptions that you

20   were providing and calculating a number?

21          A     Well, it is a mathematical exercise that

22   requires the application of -- of financial analysis

23   skills.  I mean, you can't -- as I said earlier, it's

24   not something that you could take a pencil and a piece

25   of paper.  It requires the understanding of the --

1    particularly the present value concepts and -- and how

2    these two damages scenarios relate to each other.

3         Q    I'm sorry.  When you say "present

4    value," present value of money?

5         A    The present value of money.  That's

6    generally what you present value.  Money.

7         Q    In your experience, do courts calculate

8    damages in that respect?

9         A    Do courts calculate present value?  Is

10   that what you're asking me?

11        Q    When assessing damages in cases.

12        A    The courts almost always want an expert

13   to calculate present value for them.  They don't like

14   doing present value calculations.  They will do post-

15   judgment interest.  They will assess pre-judgment

16   interest, but, often, based on someone else doing that

17   calculation, they generally don't -- they want an

18   expert to calculate present value for them.  Present

19   value is not intuitive to most people.

20        Q    Did you consider what Wyers has, in the

21   past, licensed his patents for and the rate at which he

22   did so?

23        A    No.  I did not.

24        Q    And I understand you didn't offer any

25   opinions right now, but I'm going to present a

1   hypothetical to you.  If it was the case that Wyers

2   licensed his patents in the past to various competitors

3   for -- I don't know -- let's just say 2-1/2 to

4   10 percent royalty rates, would that make you question

5   the assumption that you were provided that you should

6   apply a 24 percent royalty rate to future infringing

7   royalties?

8            A    In my experience, when you have

9   discrepancies, what you need to do is look at the

10   underlying situations that generate those differences

11   and reconcile them.  And it's possible that it might

12   change my mind if I were asked to do that, which I

13   wasn't.  It's possible that I might say, Okay, there's

14   a good reason for this difference.  I don't know what

15   the answer would be.  I don't have any information to

16   make that assessment.  And I'd need a lot of

17   information to make that assessment.  I can't make it

18   at this time.

19            Q    Did you ask for any of that information

20   when you were preparing your report?

21            A    I did not.

22            Q    So you're not offering any opinion

23   whether the royalty rate awarded against Master Lock is

24   the appropriate reasonable royalty for all potential

25   infringers; correct?

1           A     I have not provided that opinion.

2           Q     I may have asked you this, but I'm going

3      to ask it again.

4           A     That's okay.

5           Q     With respect to the two or three

6      infringers that you discuss in your report, did you

7      perform any reasonable royalty analysis for those

8      potential defendants or licensees?

9           A     Could I hear that again, please?

10          Q     Sure.  You reference two or three

11     infringers in your report that you, I guess, base the

12     future royalties on.  Did you perform any type of

13     reasonable royalty analysis for those potential

14     defendants or licensees?

15          A     I don't recall that I referenced

16     infringers in my report.  I believe I said that I read

17     about some of them and -- but other agreements and the

18     names of competitors in Ms. Salters' report, but we did

19     not do any assessment of reasonable royalties for any

20     parties.

21          Q     Okay.  That's fine.  And I was just

22     referring to back on page 3, the second full paragraph,

23     you state, "A determination of validity through

24     settlement or judgment would have greatly enhanced the

25     likelihood that Wyers would prevail against two or

Page 85

1    three other infringers for damages that, collectively,

2    were comparable to those awarded against Master Lock."

3         A    We agreed that that paragraph came from

4    the -- the amended complaint.

5         Q    Okay.  Thank you.  Going back to the

6    second calculation of your second scenario, the second

7    sentence says, "It also assumes the royalties would

8    have been received from January 1st, 2008, through

9    the estimated trial date of March 31st, 2014."

10   Why -- why did you use January 1st, 2008?

11        A    I was asked to.

12        Q    No other reason for using that date,

13   other than being asked to?

14        A    No other reason.

15        Q    Is it -- I'm just asking you as a

16   litigation consultant because I understand you weren't

17   asked this in this case, but is it your opinion that

18   subsequent trial courts are required to adopt the

19   royalty rate determined in a prior case for subsequent

20   defendants?

21        A    Well, I'm not a lawyer, and to -- I

22   think it would be inappropriate for me to give an

23   opinion as to what trial courts might or might not do.

24   Some judges do what they want to do and they are very

25   powerful people, but I don't know whether -- I couldn't

1    assess precedent or case law or local rules or whatever

2    to tell you whether that would be the -- whether the

3    judge would or would not be required to look to that

4    former rate.

5            Q    I understand that you can't see what

6    they would do, but in your opinion in the role of a

7    damages expert, would you be required to adopt the same

8    royalty rate that was set in a prior case if you were

9    handling a case against another defendant?

10           A    Typically, the work that we do is based

11   on the specific facts and circumstances, and that's the

12   first thing that we look at.  If we are being asked to

13   make those evaluations as opposed to this case where we

14   accepted assumptions that we were given to do certain

15   calculations.  And it might be something that we looked

16   at, looked at the rate that was calculated previously,

17   looked at the underlying information related to it,

18   looked at what new information might be out there.  We

19   might be asked to make a calculation assuming a

20   different number or relating to other facts and

21   circumstances that had been present in the -- in the

22   prior case.  All those things could happen.  I can't --

23   I can't say -- I can't tell you what would likely

24   happen in any sort of generic sample situation.  I

25   can't tell you.

1         Q    And those methodologies that you just

2    described, you didn't apply any of those in this case;

3    right?

4         A    No, we did not.  We were given certain

5    numbers for specific factors and we were asked to

6    relate those to each other and make calculations and

7    provide the present value factors.

8         Q    That last paragraph on page 5, there's a

9    sentence for this damages calculation, "The 24 percent

10   royalty method was used for a one-year period."  What

11   was the reason behind using that royalty -- well, let

12   me first ask this question.  What do you mean by

13   "royalty method"?

14        A    It just -- the 24 percent royalty

15   calculation was used for a one-year period.  We,

16   basically, presented it in one-year increments so you

17   can see each year.

18        Q    Oh, okay.  The sentence after that, do

19   you see that, "Lost royalty calculations based on the

20   assumptions that the infringing product is sold at a

21   rate of one unit per week each of the 52 weeks at a

22   sales price of $7.25.  The calculation includes" a

23   separate -- "includes separate calculations for the

24   product selling in either 15,000 or 20,000 stores."

25                   Do you see that?

1      A     Yes.

2      Q     And so I'll break it down by the

3  element, but you didn't do any independent research to

4  verify the assumptions that you applied to your models

5  with respect to the sales price of the product;

6  correct?

7      A     That's correct.

8      Q     And you didn't do any independent

9  research to verify the assumptions that you applied to

10 your numbers with respect to the number of sales per

11 week of the product; correct?

12     A     That's correct.

13     Q     And you did not do any independent

14 research to verify the assumptions that you applied to

15 your models with respect to the number of stores that

16 would distribute Wyers' product; correct?

17     A     That's correct.  I did note that

18 Ms. Salters assumed the $7.25 figure as, apparently,

19 she didn't have independent information relating to

20 that, so that is -- we had the same assumption relating

21 to the sales price.

22     Q     Do you know whether that sales price is

23 wholesale or retail?

24     A     I don't know.

25     Q     Did you review Wyers' historical sales

Page 89

1    to validate or confirm any of the assumptions?

2         A    I did not.

3              MR. PLUTA:  Can we just go off the

4    record?

5              (There was a discussion off the record.)

6              (There was a luncheon recess taken from

7    11:40 a.m. to 12:42 p.m.)

8         Q    (BY MR. PLUTA)  Ms. Harper, before the

9    break, we were going through your report.  I'd like to

10   right now take a look at Exhibit 102, which is the

11   first e-mail.  Or at least the first e-mail I gave you.

12   And if you can look at that first e-mail, it's an

13   e-mail from Mr. Wyers to Mr. Nelson with a copy to you.

14   My question to you is:  Do you see how Mr. Wyers

15   talks -- or writes that -- "I'll review my list, but

16   I'm thinking closer to 10,000 stores, give or take."

17        A    I see that.

18        Q    How did -- so Mr. Wyers thinks that the

19   appropriate number for the analysis is 10,000 stores?

20   Is that how you read that e-mail?

21        A    I think that he's saying that he's going

22   to look at his list, but he's thinking it's closer to

23   10, give or take.  That's what he says.  And then he

24   gives us two -- two levels and later on, gives us two

25   levels to use.  The 15 and the 20.

1    So at that point in time, he's -- he's

2    going to look at his list, but -- and at that point in

3    time, he thinks it's closer to 10, but apparently

4    determined that 15 or 20 is a more appropriate range

5    and that's -- I'm assuming that's what he's doing.

6    But, in any case, what we were given and

7    asked to assume was the 15 or 20, not the 10.

8    Q    And you're kind of hitting on what I'd

9    like to ask you about is there's, obviously, a

10   discrepancy between the 10,000 and then the 15,000,

11   20,000 that you apply in your schedules; correct?

12   A    I wouldn't say there's a discrepancy.

13   Q    Or difference.  I'm sorry.  I used the

14   wrong word.  There's a difference between the 10,000

15   stores that Mr. Wyers' give or take is referencing in

16   this e-mail versus the 15- to 20,000 that you applied

17   in your schedules; correct?

18   A    There is a difference because I think

19   the 10,000 was clearly a preliminary number.

20   Q    Okay.  So my question is, did you,

21   subsequent to this e-mail on April 29th, speak with

22   Mr. Wyers where he clarified for you that the

23   assumption that you should apply is 15,000 to 20,000

24   stores?

25   A    No.  I didn't speak to Mr. Wyers after

1    the first call that we had.

2            Q    So --

3            A    The information should be in one of

4    these e-mails.

5            Q    Take a look at Exhibit 103, then.  And

6    this is an e-mail from Mr. Nelson to you, copied

7    Mr. Wyers a couple days later on May 1.  Do you see

8    that?

9            A    Yes, I do.

10           Q    On the second page of that e-mail,

11   Mr. Nelson states at the very beginning, "The

12   infringing product sells in approximately 15,000 to

13   20,000 stores."

14                Do you see that?

15           A    On the first page?

16           Q    I'm sorry.  On the second page.

17           A    Yes.  I do see that.

18           Q    Is that -- is this e-mail what you're

19   basing the 15,000 to 20,000 number on?

20           A    Yes.  If you'll look down below, it says

21   specifically, "Please calculate lost royalties based on

22   15,000 stores and 20,000 stores."

23           Q    Okay.  But you're -- you can't confirm

24   for me whether this was a number that Mr. Nelson

25   himself just sent to you or whether this was a number

1    that Mr. Wyers conveyed to Mr. Nelson; correct?

2          A    I can't -- I can't say for sure that

3    Mr. Nelson was the source of this, but I think it's

4    very unlikely, given the history of the e-mail

5    correspondence with Mr. Wyers being copied that if

6    there was anything in here that Mr. Wyers disagreed

7    with, that he and -- that he would not have spoken up.

8    He was -- certainly had spoken up when he thought

9    something wasn't the way he thought it should be

10   previously, so the fact that him -- the fact that he

11   was copied and that he did not send us anything that

12   said no, that's wrong, do this or do that instead, gave

13   me confidence that, in fact, he agreed with what was in

14   this e-mail.

15         Q    Would you agree with me that 15,000

16   stores is not the same as 10,000 stores, give or take?

17         A    Those numbers are different, I agree

18   with you.

19         Q    And similarly, you'd agree that 20,000

20   stores is different than 10,000 stores, give or take;

21   correct?

22         A    10,000 and 20,000 are two completely

23   different numbers.

24         Q    I agree with that.

25         A    I mean, that's just a -- that's a fact

1  of life.  They're different numbers.  It doesn't say

2  anything about the quantity or -- I'm sorry -- the

3  quality of the two numbers, but they are, in fact, two

4  different numbers.

5        Q    And in fact, the more stores that are

6  applied to your analysis, the higher the damage number;

7  correct?

8        A    That's correct.

9        Q    So whether there was 20,000 stores or

10  10,000 stores, that's a pretty big difference, isn't

11  there?

12        A    It's a difference of $10,000.  I

13  wouldn't -- whether it's a big difference or a small

14  difference, it's just a difference of 10,000.

15        Q    10,000 stores?

16        A    10,000 stores, right.

17        Q    But you would apply the 10,000 stores to

18  all your other calculations; right?

19        A    Once we make an assumption about the

20  number of stores, they flow through the calculations.

21        Q    Because the number of stores would

22  depend on how many units are moving through those

23  stores; correct?

24        A    Correct.  It's a -- it's a mathematical

25  process to take the number of stores, the number of

1   units per day, and to multiply all of that out.  It

2   would change depending on the number of stores that we

3   were asked to assume.

4          Q    And you've seen no evidence, other than

5   these e-mails, and you can't determine for yourself

6   whether 10,000 stores is more appropriate than 20,000

7   stores?

8          A    We have not, and we were not asked to

9   make that determination.

10          Q    Isn't that kind of an important point

11   because of the large difference it would make in your

12   damages calculation?

13          A    I think the -- all of these things that

14   we were asked to assume are important, and I assume

15   that there will be evidence presented at trial.

16          Q    You agree with me, though, that there

17   has to be some basis in fact for the number of stores

18   that these units would flow through; correct?

19          A    Not necessarily the fact, which I assume

20   to be like historical fact.  Frequently, you have facts

21   and circumstances that tell you the situation, numbers

22   of stores, numbers of unit sales, price, whatever,

23   royalty rate.  What was existing in the past is not the

24   appropriate number to use going forward.  So to say

25   that -- that there has to be a -- a factual basis,

1    there has to be a logical basis, whether that's a -- an

2    historical fact or relationships or changes or trends

3    or other pieces of information that provide a different

4    basis for your number and all of those things are --

5    are -- are things that experts use to come up with

6    numbers to be used in calculations.  In this case, we

7    were asked to accept numbers that we were given and

8    apply them to the calculations.

9         Q    Let's assume as part of the 15,000

10   stores that Wyers presents evidence that 5,000 of those

11   stores were Auto Zone stores.  Okay?  Just -- doesn't

12   there have to be some basis that, for example, Auto

13   Zone carries the types of products that are covered by

14   Wyers' patents?

15        A    I don't know enough about the situation

16   to know whether that type of evidence would be what was

17   required by the trier of fact.  Whether in the absence

18   of that information, they would find the assumption to

19   be not -- well, adequately supported.  I don't know.

20   The -- the trier of fact is going to decide whether the

21   assumptions that we were given are adequate --

22   adequately supported by the record.  We were just asked

23   to take those assumptions and do the calculations.  We

24   were not asked to evaluate the assumptions in this

25   particular case.

1    Q    So what if -- what if Auto Zone is 5,000

2  of the 15,000 stores that you assume?  That's

3  one-third.  And it turns out that, actually, Auto Zone

4  doesn't carry any products that are covered by Wyers'

5  patents.  How would that affect your opinion?

6    A    I don't know.  I don't know.  I would

7  have to know more about why -- why the assumption was

8  made, whether they -- there could be all kinds of

9  reasons that you might make an assumption like that,

10  that in fact, they were going to start carrying that

11  product, they were going to expand the product line,

12  that there was a new vehicle out that was designed for

13  towing and they think people are going to do lots of

14  towing.  The sales of vehicles that do towing has

15  increased dramatically.  There's all kinds of things

16  that you might ask about if you were asked to evaluate

17  that assumption.  But we were not asked to evaluate

18  that assumption.

19    Q    I understand that.  And I -- I agree

20  that there may be various reasons why the assumption

21  may or may not be correct.  I'm asking you to assume

22  right now that it is incorrect, that 5,000 of those

23  15,000 stores were allocated to Auto Zone and it turns

24  out the fact is, Auto Zone doesn't carry any products

25  that are covered by Wyers' patents.  How would that

1   affect your opinion?

2          A    I don't know.  I --

3          Q    You have no idea?

4          A    No.  Let me just change that.  This

5   is -- it would not affect my opinion at all because we

6   were not asked to do that.  We were asked to make

7   calculations based on assumptions.  So it's not going

8   to affect my opinion at all.

9          Q    But it -- I think you testified earlier

10  that to the extent some of the assumptions end up to be

11  wrong or to be altered by the trier of fact, that may

12  alter your opinion?

13         A    If, in fact, that is determined by the

14  trier of fact and they say reduce the number of stores

15  from 15 to 10, then we would -- we would do that

16  calculation.  But it's -- until something like that

17  happens, I don't have an opinion about any of these

18  facts and circumstances.  I don't know enough about

19  them to have an opinion.

20         Q    But I'm asking you a hypothetical

21  question, which I'm entitled to do, and I'd like to

22  know your thoughts on if that number was decreased from

23  15- to 10,000 stores, eliminating, for example, Auto

24  Zone, how would that affect your damages calculation?

25         A    Well, as I said, I don't know enough to

1    know whether that elimination would be balanced by

2    other things.  I don't know enough.  Mechanically --

3    mechanically, if you reduce the number of stores as we

4    discussed earlier, the damages go down.  If you

5    increase the number of stores, the damages go up

6    mechanically.  Whether you ascribe it to one cause or

7    another, the result is that -- if the store -- number

8    of stores go up, damages go up and conversely, if they

9    go down, damages go down.

10           Q    Okay.  At trial, in this matter, won't

11   we only know which facts the trier of fact accepts as

12   true after a judgment?

13           MR. NELSON:  Object to the form.

14           A    I -- I don't know that that's correct.

15   In my experience, there are frequently lots of motions

16   filed before trial relating to information that comes

17   out in discovery.  Motions in limine and other types of

18   motions that seek to sort of corral the basis that each

19   side is presenting.

20           So I think it's possible that

21   determinations could be made pretrial about some of

22   the -- the facts and circumstances that are in dispute.

23   But if not, then -- then during the trial, those would

24   be assessed and then the jury or the other -- whoever

25   the trier of fact is would then, say, okay, I rejected

1   these facts and circumstances and, therefore, the

2   damages have been adjusted this way.  And -- and the

3   trier of fact frequently adjusts the damages.  You --

4   you -- they sometimes accept the damages that we

5   present as is and sometimes they say, We're going to

6   adjust them and here's the number and sometimes you

7   don't know how they got there.

8            So -- so I don't -- I don't really think

9   that that's the case that you wouldn't know what they

10  accepted until -- for all those reasons until after the

11  judgment.  But it's -- it's possible, depending on how

12  the case goes.  But it doesn't mean that the facts and

13  circumstances were ignored or that the damages were --

14  were not assessed in conjunction with the other

15  findings.  Speaking as a layperson, of course.

16       Q    Going back to Schedule 3, I'd like to

17  focus on the sales column.  And let's just take the

18  15,000-store scenario.  Why do you assume that the

19  sales do not change or vary over a five-year period?

20       A    We were given an assumption for a period

21  of time and so we applied the same assumption for each

22  year.  We didn't have any information that would -- we

23  weren't given any information that resulted in a -- in

24  changes in sales amounts per year.

25       Q    In your experience, in reviewing

1  companies' sales records, is it reasonable to assume

2  that sales of a product will not vary at all in five

3  years of sales data?

4      A    No.  It's extremely unlikely that it

5  wouldn't vary at all, but, at the same time, we often

6  look at averages, annual averages, monthly averages,

7  and that over a period of time, you take that average,

8  even though you know it'll be higher in some months and

9  lower in others.  You use the average and that's how I

10  would interpret this, that this was an average over

11  time.

12      Q    But you have no basis in fact to know

13  whether these, in fact, were averages or monthly

14  averages; correct?

15      A    No.  We -- we have not tested these.

16  This is one of the assumptions that we were asked to

17  make.  Actually, it encompasses several assumptions

18  that we were asked to make.

19      Q    And similarly, you apply a sales price

20  per unit price to the product.  How likely is it that

21  multiple sellers of a product are going to charge the

22  exact same price for a particular product?

23      A    Actually, that's fairly common,

24  depending on the marketplace.  But we -- we haven't

25  investigated this particular situation.  Again, I -- in

1    my mind, it would represent an average price.

2         Q    But similar to your last answer, you

3    haven't seen any data that suggests that it's actually

4    an average price; correct?

5         A    That's correct.  We haven't seen any

6    data, whether it's -- for any of the assumptions that

7    we were asked to assume.

8         Q    Let's go to page 6 of your report,

9    Exhibit 101.  The first paragraph talks about a final

10   calculation that you made.  Can you please explain that

11   to me?

12        A    Yes.  We were advised that the Court had

13   assessed 88,214.94 to be paid by Wyers to Master Lock.

14   And we calculated the payments that were made and the

15   interest on each of those payments at the statutory

16   rate.  The pre-judgment interest statutory rate through

17   the end of trial.

18        Q    Why did you assume that Wyers would not

19   have been assessed Master Lock's litigation costs?

20        A    Well, if the situation were they either

21   settled as in the first scenario or they had prevailed

22   in the -- in the appeal, I don't believe they would

23   have been -- in my understanding is that -- that they

24   would not have been assessed costs against -- costs

25   would not have been assessed against Wyers to pay to

1  Master Lock.  If either of those two situations had

2  occurred, there just wouldn't have been assessment of

3  costs.

4        Q    And how is that different than that --

5  you did apply out-of-pocket court-assessed costs in

6  favor of Wyers; correct?

7        A    We just assumed that it would never

8  happen.  If either of the other two scenarios had

9  happened, there would not have been a situation where

10  costs would have been assessed against Wyers.

11        Q    Right.  But in your -- in your damages

12  calculation now, are you assuming that those costs on

13  the flip side would have been assessed against Master

14  Lock had Wyers prevailed?

15        A    They are a damage element.  We're

16  assuming they just wouldn't ever have happened.

17        Q    So the out of -- the -- out-of-pocket

18  court-assessed costs in your supplemental schedules

19  Wyers out-of-pocket court-assessed costs that Master

20  Lock would have -- would have had to pay?

21        A    No.  We're just assuming that Wyers

22  would have never had to pay any court-assessed costs if

23  the case had either settled -- if it had settled, I

24  assume nobody would have paid any -- any court costs.

25  And if they had prevailed in the litigation, they would

1    not have had to have -- they will not have had to pay

2    litigation costs to -- to Master Lock.  I don't know

3    whether Master Lock would have been assessed costs or

4    not.  I don't know.

5          Q    Are damages -- in your opinion, are

6    damages and pre-judgment interest the same thing?

7          A    No.

8          Q    Why, then, in your schedules didn't you

9    separate the amounts allegedly owed to Wyers out

10   between damages and interest?

11         A    We do separate them out.

12         Q    How so?

13         A    If you look at Schedule 1, you see it

14   starts with the settlement amount and then has interest

15   and then it gets added to the settlement amount and

16   interest is laid out.  And then it's added and so on

17   all the way down through the last amount at the end of

18   trial and then the whole column is added together.  But

19   the amount is -- is separated.  It's then summarized in

20   total.  Both elements are summarized in total, but you

21   can clearly see the difference between the damage

22   amount -- the 3,500,000 -- and the interest that's

23   subsequently earned and then the cumulative amounts

24   year by year.

25               The -- and that same thing happens if

1    you look at Schedule 2A.  That same protocol is

2    followed, so you can see there the interest and the

3    damages elements are broken out and you see the same

4    thing on 2C and on Schedule 3, as well.

5         Q    But if you contend that damages and

6    pre-judgment interest are not the same thing, why would

7    you not, then, set forth a number that is the damages

8    number and then a number that is specifically the

9    interest number?  Because as I --

10        A    I'm sorry.

11        Q    I -- because as I read, for instance,

12   your Schedule 1, it says total lost settlement damages,

13   $4.9 million, which includes the interest that you

14   calculated above.

15        A    Well, damages and interest are two

16   different things, but, together, they make up what's

17   being asked for.  Asked as an award.  They -- they

18   are -- the element of the claim is both the damage and

19   the pre-judgment interest.  So to add them together

20   doesn't infer that they're the same thing.  It means

21   that you have two different elements which are -- you

22   can clearly see the -- the pieces of each which are

23   then added to -- added together.  I mean, you could

24   reorganize this schedule and do that and you could

25   certainly do that if you -- if you feel you need to see

1    it that way.  But it's -- the pieces are -- are clearly

2    in the schedules.

3              Q    I guess the reason I'm interested is, I

4    mean, in your experience, aren't these two different

5    issues to be decided by the Court?  Interest and

6    damages?

7              A    Correct.  I mean, you start with damages

8    and then the interest gets added to it.  And as I -- as

9    I testified earlier, frequently, we don't present at

10   trial the pre-judgment interest.  It's -- it's

11   presented and calculated after the -- the judge awards

12   the damages.  And so we do this calculation.  It's an

13   estimate.  It's not been authorized by the Court.  And

14   frequently, in -- in the testimony, we provide the

15   testimony about the damages and then the Court awards

16   the pre-judgment interest.

17             Q    Take a look at page 6 of your report

18   again.  I'm going to focus on the Other Matters

19   section.  And specifically, the second sentence of the

20   first paragraph under that section.  And that sentence

21   says it is based -- it -- well, let me read the whole

22   thing, just to put it in context.  "This report may be

23   used only in connection with the matter defined above

24   and is not intended for and may not be used for other

25   purposes or by anyone not directly involved in this

1  matter.  It is based solely upon the information

2  received to date, which is believed to be accurate and

3  reliable."

4          My question to you is:  How did you form

5  your belief that the information you were provided was

6  accurate and reliable?

7          A    The -- we have no -- it was represented

8  to us that this was good information.  We were asked to

9  assume it.  And -- and so instead of believed, you

10  could say assumed to be accurate and reliable.  I think

11  in this case, it would mean -- it would be the same.

12  So we -- we have assumed, we believe, that it's

13  accurate and reliable.

14          Q    You, basically, are taking Mr. Nelson

15  and Mr. Wyers' word for it?

16          A    Yes.  We are.  That they -- that they

17  have support for these numbers and will present them.

18          Q    I'm going to leave your report now.

19          (Exhibit 107 marked.)

20          MR. NELSON:  Can I take just a second?

21  I just want to clear up exhibits here.

22          MR. PLUTA:  Do you want to go off the

23  record?

24          MR. NELSON:  Sure.

25          (There was a discussion off the record.)

1          Q     (BY MR. PLUTA)   Ms. Harper, I put in

2    front of you what's been marked as Exhibit 107, which

3    is the expert report of Ambreen Salters in this matter.

4    Do you see that?

5          A     I do.

6          Q     And is this the report that you reviewed

7    prior to your deposition today?

8          A     It states Preliminary Rule 26 Expert

9    Report.

10         Q     Ms. Salters states in her report that

11   your report does not explain or establish the nexus

12   between the alleged acts and the damages claimed.   Do

13   you recall her making that criticism?

14         A     I do.

15         Q     And do you agree with that statement?

16         A     I think -- I think what she's talking

17   about is what is usually done in damages reports is

18   that you look at -- and this is what we do in the bulk

19   of our work.   You look at causation issues and tie them

20   to -- to the calculations that you have done.   In this

21   case, we have assumed -- been asked to assume that the

22   information we were given is supported and will be

23   accepted.   And so we have not done an analysis that --

24   of the underlying information.

25               However, in just reading the

1    information, it makes sense.  I mean, it generally

2    makes sense in terms of the complaints.  I didn't see

3    anything that caused me to go that doesn't make sense

4    in terms of what they're arguing over, but we were not

5    asked to make that assessment.

6              So there is what I would say limited

7    work -- a very limited amount of work that was done in

8    relating our work to -- to the -- what I call

9    causation.  Underlying causation in this case, although

10   you can't do this kind of work without applying

11   judgment to it and if I'd seen something that said to

12   me this makes no sense in terms of what's being

13   claimed, I would have said something.  I didn't see

14   that.  But that is the extent of our work as it relates

15   to causation.

16        Q    Did you calculate the probability that

17   Wyers would prevail in litigation against any remaining

18   but unnamed infringers?

19        A    I did not.

20        Q    And you didn't calculate the amount of

21   potential sale or revenue or units in the reasonable

22   royalty rate that each jury in the subsequent cases

23   would award in litigations, did you?

24        A    I did not.

25        Q    Ms. Salters criticizes your report with

1 respect to your royalty base as unsupported.  And one

2 of the criticisms she makes is that the assumptions

3 that you make are, in fact, contradicted by Wyers' own

4 history of licensing and litigation.

5 Do you agree with that statement in her

6 report to that effect?

7 A    I'm sure there was a couple things in

8 that question.  What are you asking me to agree with?

9 Q    Fair enough.  I'll break it down.  Let

10 me just set the premise.  Ms. Salters criticizes you

11 for making the assumption, let's say, for the royalty

12 base in your schedules.  Correct?  I mean, you're --

13 you read her report?

14 A    Right.  She does criticize us for that.

15 Q    Do you agree with her statement that

16 those assumptions are contradicted by Wyers' own

17 history of licensing litigation?

18 A    I can't agree or disagree because I

19 didn't do any work relating to that.  I don't have that

20 history.  I don't know.  I was asked to make

21 assumptions and do the calculations based on those

22 assumptions.  So I have not assessed any underlying

23 related data.

24 Q    So you don't necessarily disagree with

25 her?  You just haven't done the -- the analysis that

1   would allow you to agree or disagree?

2          A     I can't agree or disagree.  I don't have

3   any information relating to that topic.  And I have

4   not -- I don't believe she presented enough information

5   to be clear, either, but I wasn't asked to look at

6   that.  And when you look at something like that, you

7   need to look at all -- all sides of it.  And we were

8   not asked to do that and I have not done that and would

9   not be comfortable rendering an opinion either way.

10         Q     What information do you think she left

11  out that she should have included?

12         A     I don't know.  It just -- her -- it

13  appeared relatively general, what she was saying.  I

14  don't know what she had.  I don't know what she left

15  out.  I couldn't comment on that.

16         Q     So you didn't -- her report is

17  footnoted, as you see.  You didn't ask to see any of

18  the underlying documents that formed the basis of

19  Ms. Salters' opinion?

20         A     I did not.

21         Q     Do you intend to do that prior to trial?

22         A     It's not what I've been asked to do as

23  of this time.  It's possible I could be asked to do

24  some additional work, but I have not been asked to do

25  it at this time.

1      Q     Would you agree with Ms. Salters that

2 you did not specifically identify accused products and

3 the corresponding infringers that were making and

4 selling and offering these products?

5      A     We did not make that identification.  We

6 were not asked to do so and we weren't given that

7 information as an assumption, either.

8      Q     So the answer is yes, you agree with

9 her?

10      A     What was the question?

11      Q     I said do you agree with Ms. Salters

12 that you did not specifically identify accused products

13 and the corresponding infringers that were making,

14 using, selling, or offering for sale those products?

15          MR. NELSON:  Object to form.

16      A     We did not make that assessment for the

17 reasons I've stated.

18      Q     (BY MR. PLUTA)  In a general nature,

19 after having reviewed Ms. Salters' report, do you

20 disagree with any aspect of her report?

21      A     I haven't made a list, I haven't brought

22 you a list of the things that I think I have questions

23 about, but, in general, I think that there's a -- an

24 approach that this is a -- meant to be an assessment of

25 reasonable royalties.  That it's a -- that type of a

1   claim, but as I -- I've said in my view, this is a -- a

2   case within a case, malpractice-type claim and -- and I

3   think those are different.  I'm not sure that the --

4   that the approach that's being taken as it relates to

5   the -- to the overall case addresses this case-within-

6   a-case approach.  That is -- that is admittedly

7   different and can be difficult.

8           And they typically come up within legal

9   malpractice cases, although I've seen some -- I think

10  it's pretty much legal malpractice.  So -- so some of

11  these -- some of these factors, I'm not sure are as

12  relevant as they might be.  I didn't -- I couldn't

13  follow some of the summaries that she did in terms

14  of -- of the sources and how the numbers fit together.

15      Q    In order to project future royalties

16  that Wyers allegedly was denied as a result of

17  defendants' alleged malpractice, aren't you required to

18  assess what a reasonable royalty is with respect to the

19  value of those patents?

20      A    I'm sorry.  I was a little distracted.

21  I was looking at something and I didn't hear the

22  beginning.  Could you say that again or have it read

23  back?

24           (The referred-to question was read by

25  the reporter.)

1      A     In -- in the situation where there's

2   been an adjudication, where there's been an award,

3   and -- and then that -- that award was lost through

4   what is claimed to be malpractice, you have -- you have

5   the findings that you are looking to enforce as opposed

6   to the underlying case that has already been argued.

7   This is all part of the legal practice.

8                It's not part of what we do, but -- but,

9   generally, when you're looking at a case within a case,

10  you're looking at a case that was lost through claimed

11  malpractice and so you're looking at enforcing, getting

12  the benefit of the judgment that was lost for whatever

13  reason.

14                In this case, there was actually a

15  judgment, a jury verdict, a settlement offer, and so

16  you have those -- those facts, you have that data, and

17  so you -- you're going forward with that.  And that is

18  your -- your complained-about damages is that you lost

19  those benefits that have already been determined by a

20  trier of fact.

21                So you're not going back and doing the

22  underlying case again.  You're looking at the case --

23  the result of the case or anticipated result of the

24  case, so it's a -- it's a different process.  So I'm

25  not -- in my view, that is where you should be going

1  and that is generally, as I understand the literature,

2  what you do when you are arguing a case within a case

3  where there's malpractice.

4          Q    But aren't you going too far when you

5  project those same royalties on to unnamed and fewer

6  licensees without having done a reasonable royalty

7  analysis with respect to those future licensees?

8          A    I've not assessed that in this case.  I

9  wasn't asked to do it.  I don't know.

10         Q    If you turn to page 10 of Ms. Salters'

11 report, Exhibit 107, there's a table summarizing Wyers'

12 patents and the parties against whom these patents have

13 been asserted.  Have you -- you haven't reviewed any of

14 the settlement agreements listed in this table, have

15 you?

16         A    I have not.

17         Q    Do you know which patent -- Wyers patent

18 was at issue in the Master Lock case?

19         A    I was actually trying to figure out the

20 number from reading the report and I wasn't sure based

21 on reading the report and I hadn't asked what the

22 number was.  So no, I don't know.

23         Q    So I'm guessing -- or strike that.

24              You don't know if any of the settlement

25 agreements listed in table 10 -- I'm sorry -- on page

1    10 of Ms. Salters' report includes licenses or releases

2    from Wyers for the 115, 426 or the 649 patents?

3            A    She lists the patents.  She lists the

4    patent number in the first column.  So there -- I have

5    some knowledge about which one she's referring to in

6    the column.

7            Q    But you don't know the -- the details of

8    the agreements to determine whether or not Wyers

9    released that particular defendant from liability with

10   respect to that patent; correct?

11           A    No.  I already -- I already told you

12   that I haven't looked at the -- any of the agreements

13   relating to any of these claims.

14           Q    Is that something that would be helpful

15   to know, to understand the identities and sales volumes

16   of Wyers' potential licensees?

17           A    For what we were asked to do, no, we

18   don't -- it would not be helpful.

19           Q    What about generally?  Would it be

20   helpful generally to know the -- and understand the

21   various identities and sales volumes of Wyers'

22   potential licensees?

23           A    It would depend what we were doing,

24   whether it was helpful or not.

25           Q    If you're coming up with a royalty that

1  you'd like to project on to other licensees and assess

2  those damages against defendants, wouldn't it be

3  helpful to know and understand the identities and sales

4  volumes of Wyers' potential licensees?

5       A    It's possible.  It really does depend on

6  the facts and circumstances.

7       Q    You don't know in the settlements that

8  are listed here on page 10 of Ms. Salters' report

9  whether the settlement amounts paid in those cases

10 covered past infringement of the 115, 426, or 649

11 patents for those defendants that settled, do you?

12      A    I don't have any information about the

13 settlements.  I haven't read the documents and I've not

14 been provided any information because it was not part

15 of what I was asked to do.

16      Q    As a general matter, wouldn't it be

17 relevant to an analysis of projecting future royalties

18 on unnamed licensees in order to assess damages against

19 defendants here to know the potential sales from

20 licensees of Wyers products?

21      A    I don't have enough information about

22 this to know -- to answer that question.

23      Q    Let me ask you a question.  I don't mean

24 to sound trite, but what -- what are you going to offer

25 to the jury in this case with respect to the proper

1    royalty rate of Wyers' patents in order to project

2    damages for lost opportunity on to defendants?

3             A    I am not going to be proffering an

4    opinion about appropriate royalty rates.  That is not

5    what I'm going to be doing.  I'm going to be providing

6    an opinion that if the assumptions that we were given

7    are accepted by the trier of fact, then here -- if you

8    apply those numbers, then here is the calculation of

9    what the damages are.

10            Q    Couldn't the jury do that itself?

11            A    I don't think so.

12            Q    I mean, if the jury takes your

13   assumptions -- and let's assume that they believe the

14   assumptions are correct and all the evidence was put in

15   and they were -- they said, you know, the average sale

16   price is $7.25, you know, a unit per day per store at

17   15,000 stores.  You don't think the -- the jury could

18   do the multiplication to add up the appropriate damages

19   in this case?

20            A    In my experience, no.

21            MR. PLUTA:  Let's go off the record.

22            (There was a recess taken from 1:33

23   p.m. to 1:44 p.m.)

24            MR. PLUTA:  Okay.  So we can go back on

25   the record.  Ms. Harper, thank you.  I have no further

1    questions.

2                MR. NELSON:  I don't have any questions,

3    either.  Thank you.

4                ... WHEREUPON, the deposition was

5    concluded at 1:45 p.m.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  SIGNATURE OF DEPONENT

2      I, MELINDA M. HARPER, CPA, the deponent

3  in the above named deposition, have read the above and

4  foregoing deposition, and the same is a true and

5  accurate transcript of my testimony, save and except

6  for changes and/or corrections, if any, as indicated

7  by me on the amendment sheet(s) attached hereto as

8  indicated.

9  Amendment sheet(s) attached (    )

10  No changes and no amendment sheets attached (   )

11

12  _____

   MELINDA M. HARPER, CPA

13

14      The signature of MELINDA M. HARPER, CPA

15  was subscribed and sworn to before me this _____ day of

16  _____, 2013.

17      My Commission expires:

18  _____

   Notary Public

19

20

21

22

23

24

25

1                    CARPENTER REPORTING, INC.
                   Certified Shorthand Reporters
2                 Registered Professional Reporters
                    12510 East Iliff, Suite 120
3                       Aurora, CO  80014
4     October 8, 2013
5

      Matthew Nelson, Esq.
6     Semler & Associates, P.C.
      1775 Sherman Street
7     Suite 2015
      Denver, CO  80203
8

9     RE:  Wyers, et al. v. Greenberg Traurig, et al.
10    Dear Mr. Nelson:
11                    Enclosed please find your copy of the
      deposition of MELINDA M. HARPER, CPA, along with the
12    original signature page and correction sheets for her
      use.  Would you please have her read your copy of the
13    deposition and if she finds any changes necessary, have
      her make them on the correction sheets provided.  Be
14    sure that she signs each correction sheet that she may
      use.  Then have her sign the original signature page
15    before a notary public and return the signature page
      and the correction sheets to me at the above address.
16

17                    I request that you comply with the above
      within thirty-five (35) days.  Thank you for your
18    assistance and cooperation and if you have any
      questions concerning the above, please feel free to
19    contact me.

20    Yours truly,
21

22    Bonnie Carpenter, CSR, RPR, CRR
23    cc:  Robert G. Pluta, Esq.
24    Trial Date:  None
25

```
 1                    CARPENTER REPORTING, INC.
                     Certified Shorthand Reporters
 2                 Registered Professional Reporters
                     12510 East Iliff, Suite 120
 3                       Aurora, CO  80014
                         (303) 752-1200
 4
     ROBERT G. PLUTA, ESQ.
 5   Steptoe & Johnson, LLP
     115 So. LaSalle Street
 6   Suite 3100
     Chicago, IL  60603
 7
     Re:  Wyers, et al. v. Greenberg Traurig, et al.
 8        Civil Action No. 12-cv-00750-WYD-CBS
          United States District Court
 9        District of Colorado
10
     Dear Mr. Pluta:
11
              Attached is the original deposition of
12   MELINDA M. HARPER, CPA, taken in the above cause.
13        Deposition not signed           _____
          Deposition signed by the deponent
14           No corrections               _____
          Deposition signed by the deponent
15           correction sheet(s) included therein,
             and copy(ies) of same forwarded to
16           interested counsel           _____
          Signature waived                _____
17
              Please retain the original copy of the
18   deposition UNOPENED in your possession until such time
     as it is required by any party in a hearing or trial of
19   the above cause.
20   Yours truly,
21
22   Bonnie Carpenter, CSR, RPR, CRR
23   cc:  Matthew Nelson, Esq.
     Trial Date:  None
24   RECEIVED BY _____DATE_____
25
```

1                    C E R T I F I C A T E

STATE OF COLORADO          )

2                            ) ss

COUNTY OF ARAPAHOE         )

3

              I, Bonnie Carpenter, duly appointed to
4    take the deposition of MELINDA M. HARPER, CPA, hereby
     certify that previous to the commencement of the
5    examination of the said above-named Deponent, she was
     first by me duly sworn to testify the truth, the whole
6    truth and nothing but the truth touching and concerning
     the matters in controversy between the parties hereto,
7    so far as she should be interrogated concerning the
     same;

8

              That said deposition was
9    stenographically reported by me at the time and place
     heretofore set forth, and was reduced to typewritten
10   form under my supervision as per the foregoing;
11            That the foregoing is a true and
     correct transcript of my shorthand notes then and
12   there taken;
13            That after the deposition was
     transcribed, the same was submitted by letter to the
14   Deponent for reading and signing, a copy of which is
     hereto annexed;

15

              That I am not kin or in anywise
16   associated with any of the parties to said cause of
     action or their counsel and that I am not interested
17   in the event thereof;
18            IN WITNESS WHEREOF, I have hereunto
     set my hand this _____ day of _____,
19   2013.

20

21            _____

                   Bonnie Carpenter
22                 12510 East Iliff
                   Suite 120
23                 Aurora, CO  80014

24

25